No. 85-567

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

FIRST NATIONAL BANK OF GLASGOW,

       Plaintiff and Respondent,

  -vs-

FIRST SECURITY BANK OF MONTANA,
N.A.,

       Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Seventeenth Judicial District,
             In and for the County of Valley,
             The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Gallather, Archambeault & Knierim; Matthew Knierim,
        Glasgow, Montana

    For Respondent:

        Moulton, Bellingham, Longo & Mather; Sidney R. Thomas,
        Billings, Montana

_____

Submitted on Briefs:  March 6, 1986

Decided: June 17, 1986

Filed:  JUN 17 1986

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

First Security Bank appeals from an order of the District Court, Seventeenth Judicial District, Valley County granting summary judgment to First National Bank (FNB). We affirm.

The issue in this case is which bank has a prior perfected security interest in certain livestock and their progeny. First Security Bank began lending money to James J. Murnion, as rancher, in 1976 on an unsecured basis. In October, 1977, First Security had Murnion execute a security agreement which took a security interest in:

    350 Cows, 3 to 7 years
    160 Heifers, 2 years
     20 Bulls
    400 Calves
    140                    Cattle Branded:    RS (⊢⟶)
     70

    together with the young and produce thereof and all
    other livestock and poultry now owned or hereafter
    at any time acquired by Borrower or in which
    Borrower obtains rights; all of which are or will
    be located at
            20 miles East of Jordan
        on premises owned by:
                    James J. Murnion

A financing statement was filed in Garfield County describing all livestock branded with the lazy TJ brand and stating they were located 20 miles east of Jordan. Each year Murnion executed new security agreements in favor of First Security Bank.

In April, 1980, Murnion contacted First Security Bank and asked if the Bank would loan additional funds so that Murnion and his partner could purchase about 513 heifers. First Security would not finance the purchase but agreed to loan $40,000 as a downpayment. Murnion went to First

- 2 -

National Bank. FNB agreed to loan Murnion $152,000 for the purchase of 513 heifers with the Rafter B brand. On April 30, 1980, Murnion executed a security agreement giving FNB a security interest in "513 yearling heifers branded: Rafter B L.R. together with the young, products, and produce thereof and all similar property whenever acquired, located or to be located at McCone County on premises belonging to Jack Rosenwald." FNB mistakenly filed its financing statement in McCone County where the cattle would be pastured.

In July, 1980, Murnion told the president of First Security Bank of the loan by FNB. Murnion disclosed the amount of the loan, that FNB was the lender, and that the money was used to purchase the Rafter B heifers. He also told the bank president that he would be selling the heifers by November, 1980, and that part of the sale proceeds would go to FNB.

In 1982, First Security began to have concerns about Murnion's financial condition and informed him that the loan would be due in full at the maturity date. First Security also had Murnion execute a new security agreement and financing statement granting First Security a security interest in all Murnion's livestock, including the Rafter B cattle. The new security agreement deleted reference to the lazy TJ brand and described the collateral as located at Garfield, Custer, and Valley Counties.

On March 24, 1982, in accordance with his usual practice, Murnion attempted to deliver a check to FNB from the proceeds of the sale of the Rafter B-branded cattle. First Security objected to this and called the purchasers to tell him that First Security was claiming an interest in all of the cattle, not just the lazy TJ cattle. First Security's

loan comment sheets of that date indicate that Murnion told them that this would "put him in a bad light with First National Bank."

Subsequent cattle sales were lost because First Security told potential purchasers that they would be sued for conversion if any of the proceeds were paid to FNB. When representatives of FNB discovered the situation, they offered to allow the funds to be placed in a trust account for later resolution in order to avoid the prospect of a lost sale. This was done in subsequent sales with the intention of allowing the sales to proceed without the priority dispute being litigated each time. Three sales occurred, two involving Rafter B-branded cattle, prior to Murnion's filing of a bankruptcy petition. Further sales of the Rafter B-branded cattle and their progeny occurred following the bankruptcy petition. The funds from the later sales are being held in a trust account pending the resolution of this case.

The bankruptcy judge determined that he did not have jurisdiction over this matter, and remanded this cause to the District Court of the Seventeenth Judicial District. The Honorable Leonard H. Langen, in a thorough opinion and order, granted summary judgment in favor of FNB. We agree that this case as presented is a proper subject for summary judgment since no genuine issues of material fact remain.

We turn to the issue of which bank has a prior perfected security interest in the cattle. When First Security Bank took a security interest in Murnion's cattle in 1977, the security agreement attempted to be at once general and specific. The specific cattle which secured the loan were typed on the agreement as:

- 4 -

```
350 Cows, 3 to 7 years
160 Heifers, 2 years
 20 Bulls
400 Calves                    Cattle Branded:   RS (⊢→)
140
 70
```

However in boilerplate language the agreement also referred to "all other livestock and poultry now owned or hereafter at any time acquired . . . all of which are or will be located 20 miles east of Jordan."

In interpreting this security agreement we begin with the standard set out in § 30-9-110, MCA, which states:

> For the purposes of this chapter any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

We also note that the purpose for the requirement of a written description of collateral in the security agreement is different than that in the financing statement. The purpose of the description of collateral in the financing statement is to put third parties on inquiry notice of the existence of a security interest. The purpose of the description of collateral in the security agreement is to act as a statute of frauds. It allows discovery by creditors of the debtors affairs, and names the collateral securing the loan so as to prevent later disputes over what secured the loan. White and Summers, Uniform Commercial Code pp. 787-88 (1972). As such, the description of the collateral in the security agreement must reasonably lead the impartial observer to the collateral in question. Id.

While the language of this security agreement is not a model of clarity in drafting, we hold that the security agreement creates a general lien on all livestock located on the Murnion ranches 20 miles east of Jordan. The agreement refers to specific cattle which were branded with the lazy TJ

brand and takes a security interest in their produce and young. The next line is an after-acquired property clause which refers to "all livestock now owned or hereafter acquired." It is substantially similar to this description which has been held sufficient to create a general lien on all cattle:

> all livestock . . . now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to the following:

U.S. v. S.E. Mississippi Livestock Farmers Ass'n (5th Cir. 1980), 619 F.2d 435; U.S. v. Mid-States Sales Co. (D.C. Neb. 1971), 336 F.Supp. 1099.

While the above language would have made the security agreement in question clearer, it is nonetheless sufficient to create a general lien on all cattle owned by Murnion.

However, the security agreement states that all the livestock covered by the agreement "are or will be located at 20 miles east of Jordan on premises owned by: James J. Murnion." We note that it is not necessary to set out the location of livestock in a security agreement or financing statement. Section 30-9-203, MCA; § 30-9-402(1), MCA.

FNB argues that since the location was included, we should follow Matter of California Pump and Manufacturing Co. (9th Cir. 1978), 588 F.2d 717 and 8 Anderson, UCC (3rd ed. 1985), § 9-110:9 p. 606 in holding that a statement of location in a security agreement acts to limits the description of the collateral to the property located within the geographic area described.

First Security argues the location should not be a limiting factor, but should be taken as a promise by the debtor to keep the collateral at that location, and as an aid

in describing the collateral relying on In re Lee (E.D. Tenn. 1981), 32 U.C.C. Rep. 580. Even if this were so, we fail to see how a security interest covering cattle located 20 miles east of Jordan on premises owned by James J. Murnion can aid in describing cattle located in McCone County on premises owned by Jack Rosenwald. We think this is a case where, had First Security foreseen this circumstance they would have drafted their security agreement to cover these cattle, but they did not, and it does not.

We hold First Security's security agreement is limited to cattle located 20 miles east of Jordan on premises belonging to James J. Murnion.

FNB, on the other hand, took a security interest in 513 heifers branded Rafter B located at McCone County on premises belonging to Jack Rosenwald. It had a purchase money security interest in the cattle under § 30-9-107, MCA. In order to perfect the purchase money security interest FNB should have filed the financing statement in accordance with § 30-9-401. The official comments to § 30-9-109, MCA, state that cattle are farm products, thus the financing statement should have been filed in Garfield County, the county of the debtor's residence, pursuant to § 30-9-401(1)(a). However, FNB mistakenly filed in McCone County where the cattle were to be pastured. Thus FNB does not have a perfected security interest in the Rafter B cattle. However, FNB contends it should take precedence over First Security because of the good faith filing exception in § 30-9-401(2), MCA, which states:

> A filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regard to any collateral as to which the filing complied with the requirements of this chapter and is also

> effective with regard to collateral covered by the
> financing statement against any person who has
> knowledge of the contents of such financing
> statement.

Good faith is defined as honesty in fact by § 30-1-201(19),
which is incorporated in Article 9 by § 30-9-105(4). There
was testimony adduced at the depositions that it was "common
banking practice" to file a financing statement in the county
where the collateral was located. While we note that this
will soon be moot under the 1985 code which adopted central
filing effective July 1, 1986, we hold this filing in the
wrong county by the purchase money lender did constitute a
good faith attempt to comply with the code requirements. A
good faith filing is effective against any person who has
knowledge of the contents of such financing statement.
"Knowledge" is defined as actual knowledge in § 30-1-201(25).
There is no requirement that a party actually see the
financing statement in order to have actual knowledge of its
contents. However, the party must know the names of the
parties, their addresses, and a description of the
collateral. Section 30-9-402(1), MCA; 8 Anderson UCC §
9-401:47 p. 419; 47 U of Colo L.Rev. 467 (1976). In this
case, Conrad Tvedt, president of First Security Bank, states
in an affidavit that Murnion approached him about loaning
funds to finance the purchase of the Rafter B cattle. Tvedt
stated First Security would only loan $40,000. Murnion
indicated that other parties, Glasgow Livestock and
Fjeldheim, would help in the transaction. Tvedt stated that
he knew Fjeldheim was financed at FNB which is located about
one-half block away from First Security in Glasgow. In the
financial statement Murnion told Tvedt that FNB had loaned
him the money to purchase the calves, and the amount of the

loan. In the financial statement Murnion filled out for First Security on July 3, 1980, he listed under the category "Loans to Purchase Machinery & Equipment" a loan from FNB of Glasgow for $152,000 due 11-1-80. Also noted is the heifers Rafter B brand. The loan comment file states:

> He purchased 508 yearling heifers through the Glasgow Livestock Sales Yard that were financed by the First National Bank and is making a reduction there including interest of $60,000, leaving a balance owing of $152,000 due November 1, 1980, which are branded seperately [sic] and which he will market.

Here, First Security knew not only of the names and addresses of the parties, and the collateral in question, but also the exact amount of the loan. On appeal, First Security argues that Murnion did not tell them if or how the loan was secured. Yet the 1982 agricultural financing statement of Murnion lists the loan from FNB as secured.

This situation is clearly distinguishable from the situation in Taylor Rental Corp. v. First Citizens Bank (D.C. Mont. 1982), 539 F.Supp. 228, in which a computerized journal entry made by an accounting service in a confidential report provided by a parent company to a franchiser showed a bank loan by an unidentified bank. Judge Battin held in that case that the journal entry was not knowledge of the security interest held by a specific bank. But that situation is wholly different than the one at hand where one bank president had full knowledge of the security interest of the other bank.

Last, First Security argues that even if FNB has a purchase money security interest in the Rafter B heifers, the purchase money security interest does not extend to the progeny of the heifers. The security interest of FNB clearly

does extend to the progeny of the heifers because the security agreement lists as collateral:

> 513 yearling heifers branded: Rafter B   LR
> together with young, products, and produce thereof
> and all similar property whenever acquired, located
> or to be located at McCone County on premises belonging
> to Jack Rosenwald:

We affirm that FNB does not have a perfected purchase money security interest in the Rafter B heifers and their young but that its security interest in the cattle and their young is valid against First Security because First Security had actual knowledge of FNB's security interest.

_____
John C. Sheehy
Justice

We Concur:

_____
John Conway Harrison

_____
Paul G. Hatfield

_____
_____

_____
L. C. Gulbrandson
Justices