FARMERS STATE BANK & TRUST COMPANY, APPELLEE, *v.* MIKESELL ET AL., APPELLANTS.

(No. CA1201—Decided
June 10, 1988.)

*William H. Bertram, Jr.,* for appellee.

*Craig D. Heckman,* for appellants.

FAIN, J. Defendants-appellants Bob Mikesell, his wife Juanita Mikesell, his sons Kent and Bruce Mikesell, and Mikesell Brothers Farm (a partnership consisting of Bob, Kent, and Bruce Mikesell) appeal from a decision entered in the Darke County Court of Common Pleas holding that plaintiff-appellee Farmers State Bank & Trust Co. ("Farmers State") is entitled to possession of livestock and a tractor owned by Mikesell Brothers Farm.[1] In the alternative, the trial court awarded Farmers State judgment in the amount of $31,103.13 plus interest.

After reviewing the record, we conclude that under the Uniform Partnership Act as enacted in Ohio (R.C. Chapter 1775), an attempt by a partner to secure a personal debt by pledging his interest in specific partnership assets does not create a lien in favor of the partner's creditor as to those assets. We further hold that an action

---

[1] Hereinafter, the defendants-appellants will be referred to collectively as "the Mikesells."

by a creditor to recover collateral pledged by a debtor and then wrongfully transferred by the debtor is not timely when it is brought more than four years after the creditor had constructive notice of the transfer.

Defendants Paul Mikesell (another son of Bob) and Gro-Lean Gilts of Ohio not having appealed from the judgment, the judgment of the trial court against them will stand; in all other respects, the judgment of the trial court will be reversed, and judgment will be entered in favor of defendants-appellants Bob Mikesell, Kent Mikesell, Bruce Mikesell, Mikesell Brothers Farm, and Juanita Mikesell.

## I

Bob Mikesell testified at trial that since the mid-1970s he has operated a hog farm located on Stephens Road in New Madison, Ohio. Bob Mikesell's farm is described in the record as a "farrow to finish operation," meaning that after hogs on the farm are bred, the resulting offspring are raised to a certain weight and then sold. According to Bob Mikesell, this process is repeated twice each year and approximately fifteen hundred to sixteen hundred young are produced in each breeding cycle.

On March 5, 1976, Bob Mikesell and his son Paul Mikesell entered into an unrecorded partnership agreement creating Gro-Lean Gilts of Ohio ("Gro-Lean Gilts"). According to the agreement, the purpose of Gro-Lean Gilts was to be "* * * the purchase, raising and selling of hogs and all things necessary and incident thereto." Section 10 of the partnership agreement stated that "[n]o partner shall assign, pledge or mortgage any of the partnership property or interest therein or do anything or permit any act whereby the firm's money, interest, or property of [sic] his interest therein may be liable to seizure, attachment or execution without the expressed, written consent of the other partner."

The present case arises from a series of loan transactions between Paul Mikesell and Farmers State. On November 23, 1979, Paul Mikesell borrowed $21,800 from Farmers State in his own name and gave the bank a security interest in a 1973 International Harvester tractor and twenty-one Black Angus beef cows. It appears from the record that Paul Mikesell owned the tractor and the cattle individually. Farmers State perfected its interest in the collateral by filing a financing statement with the Darke County Recorder's office on November 28, 1979.

On July 18, 1980, Paul Mikesell individually borrowed $6,000 from Farmers State and gave the bank a security interest in a 1973 Hough front-end loader. Farmers State perfected its interest in the collateral by filing a financing statement on July 31, 1980.

Later in 1980, on December 15, Paul Mikesell borrowed an additional $14,000 from Farmers State and gave the bank a security interest in livestock owned by Gro-Lean Gilts.[2] Farmers State filed a financing statement covering the livestock on December 17, 1980. Both the security agreement and the financing statement described the

---

[2] In a financial statement Paul Mikesell submitted to Farmers State at the time he applied for this loan, he listed "½ Gro-Lean Gilts" under the asset column and gave a value of $130,392. It appears that Bob Mikesell also listed a one-half interest in Gro-Lean Gilts as an asset in financial statements he gave to Farmers State. It is also worth noting that on November 26, 1980, Farmers State loaned $15,000 to Gro-Lean Gilts. Both Bob and Paul Mikesell signed the promissory note evidencing this obligation.

collateral as "½ Interest in 350 Sows, 15 Boars, 1,000 Fat Hogs."

There is no indication in the record that Bob Mikesell knew of or authorized Paul Mikesell's pledge of partnership assets.

Bob Mikesell testified at trial that Paul Mikesell lost interest in hog farming and left Gro-Lean Gilts on January 1, 1982. According to Bob Mikesell, he acquired his son's interest in the partnership in return for agreeing to forgive certain debts owed to him by Paul. On November 29, 1982, a notice of dissolution was filed in the Darke County Recorder's office stating that Gro-Lean Gilts had been dissolved effective January 1, 1982.

David Shives, an officer of Farmers State, testified at trial that he had not seen the notice of dissolution. According to Shives, although the Mikesells had extensive dealings with Farmers State, they had not informed the bank that Paul Mikesell was no longer active in the hog farming business. Shives testified that he personally had seen no outward indications that there had been a change in the operation of the Mikesell farm.

It appears from the record that at some time, the Mikesell family formed another partnership, Mikesell Brothers Farm.[3] The original members of this partnership were Bob, Paul, and Kent Mikesell. Bruce Mikesell became a partner at a later time. Bob Mikesell testified at trial that Mikesell Brothers Farm was at first concerned solely with a grain-farming operation which was attendant to the hog farming business. However, according to Bob Mikesell, a decision was made at some point to informally merge the grain farming operation with the hog farming operation in order to obtain financing. Eventually, Mikesell Brothers Farm ran both operations.

It appears that sometime late in 1982, after the hog farming operation had been merged with the grain farming operation, Paul Mikesell left Mikesell Brothers Farm.[4] However, the record indicates that even after Paul Mikesell left the partnership, he occasionally worked on the Mikesell farm during busy periods. Bob and Kent Mikesell testified that although Paul Mikesell worked on the farm, they did not consider him an "employee" since he received no compensation. Rather, according to Bob and Kent, there was a tacit understanding that Paul would receive credit against some unspecified debt in return for his labor.

On April 14, 1984, Paul Mikesell borrowed $25,000 from Farmers State. The bank filed a series of statements with the Darke County Recorder's office continuing its security interest in the International Harvester tractor, the twenty-one beef cows, the Hough front-end loader, and the one-half interest in sows, boars, and hogs.

However, unbeknownst to Farmers State, Paul Mikesell had sold the International Harvester tractor to

---

[3] The record is unclear as to when Mikesell Brothers Farm was created. Bob Mikesell stated in a deposition taken June 3, 1986, that the partnership was formed in April 1982. At trial, Bob Mikesell testified that that partnership was created sometime in 1981. Kent Mikesell seemed to have no recollection of when the Mikesell Brothers Farm partnership was created.

[4] However, at the hearing below, Farmers State placed into evidence a 1985 W-2 form prepared for an employee of Mikesell Brothers Farm that lists Paul Mikesell as a partner. According to Bob Mikesell, Paul's name was on the form because he never informed the Internal Revenue Service that Paul was no longer a partner.

Mikesell Brothers Farm in 1980.[5] One of the exhibits at trial was a check drawn on the Mikesell Brothers Farm account at Farmers State made payable to the order of Paul Mikesell. The check, dated May 12, 1980, was for $40,000. According to Bob Mikesell, $14,000 of this amount represented payment to Paul Mikesell for the International Harvester tractor. The remaining $26,000 was for another piece of farm machinery the partnership had purchased from Paul Mikesell at the same time. Bob and Kent Mikesell testified that at the time Mikesell Brothers Farm purchased the tractor from Paul Mikesell, they did not know that it was subject to a security interest.

On February 7, 1985, Paul Mikesell filed for bankruptcy under Chapter 7 of the Bankruptcy Act (Section 701 et seq., Title 11, U.S. Code).

Shives testified at trial that he had gone to a meeting of creditors and had been told by the trustee in bankruptcy to go out to the Mikesell farm and pick up the collateral pledged by Paul Mikesell.[6] However, according to Shives, Bob and Bruce Mikesell had refused to turn the property over to him. Shives said that as of the time of the proceedings below, Farmers State had not received any collateral to apply against Paul Mikesell's debt.

On October 17, 1985, Farmers State filed a complaint against Paul Mikesell, Bob Mikesell and Gro-Lean Gilts. On October 30, 1986, Farmers State amended its complaint and named all the immediate members of the Mikesell family, Gro-Lean Gilts,

and Mikesell Brothers Farm as defendants. Farmers State demanded judgment in the amount of $31,103.13 plus interest at the rate of twenty percent per year from August 30, 1985. The complaint also requested an order that the personal property shown in the security agreements signed by Paul Mikesell be recovered from the defendants and sold. Finally, the complaint requested punitive damages in the amount of $100,000 plus attorney fees and costs.

This case was tried to the court on July 23, 1987. Paul Mikesell did not testify.

In a decision filed September 2, 1987, the trial court held that Mikesell Brothers Farm had purchased the International Harvester tractor subject to a lien held by Farmers State. The court also found that Paul Mikesell's assignment of his interest in the three hundred fifty sows, fifteen boars, and one thousand hogs was valid. Moreover, according to the trial court, the record supported a conclusion that Bob Mikesell and Mikesell Brothers Farm knew about and had ratified Paul Mikesell's pledge of his partnership interest. The court held that when Paul Mikesell left Mikesell Brothers Farm, the other members of the partnership had acquired his interest in the livestock subject to Farmers State's lien. Therefore, according to the trial court, Farmers State was entitled to possession of the International Harvester tractor and a one-half interest in livestock owned by the Mikesells in payment of Paul Mikesell's defaulted loan.[7] In the alternative, the trial court

---

[5] The security agreement in which Paul Mikesell purported to give Farmers State a security interest in the tractor contained the following provision: "Debtor further warrants, covenants and agrees: * * * that debtor shall not misuse, abuse, sell or attempt to sell * * * the collateral."

[6] It appears that at all times relevant to this appeal, the livestock and the International Harvester tractor have been located at the Mikesell family farm on Stephens Road.

[7] Execution of the trial court's judgment has been stayed pending appeal.

granted judgment in favor of Farmers State in the amount of $31,103.13 plus interest. From this decision, the Mikesells appeal.

## II

The Mikesells' first and second assignments of error are as follows:

"The court committed reversible error in recognizing the validity of a security agreement never signed by the debtor.

"The trial court committed reversible error when it ruled that Farmers State Bank had a valid security interest in the hogs of Gro-Lean Gilts."

R.C. 1309.14(A) (UCC 9-203[1]) provides that a security interest does not attach and is not enforceable against the debtor unless:

"(1) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

"(2) Value has been given; and

"(3) The debtor has rights in the collateral."

In their first assignment of error, the Mikesells argue that Farmers State did not have a valid security interest in the hogs since the requirement of R.C. 1309.14 that the security agreement be signed by the debtor was not met. According to the Mikesells, Paul Mikesell was not the "debtor" for purposes of R.C. 1309.14, since Gro-Lean Gilts was the true owner of the hogs.

R.C. 1309.01(A)(4) (UCC 9-105[1][d]) defines the term "debtor" as follows:

"* * * [T]he person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of sections 1309.01 to 1309.50 of the Revised Code dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires."

In our opinion, the issue of whether Paul Mikesell's signature on the security agreement was sufficient to give Farmers State a security interest in the hogs is inextricably intertwined with the issues of what ownership rights Paul Mikesell had in the assets of Gro-Lean Gilts and what authority he had to act on behalf of the partnership. Since the Mikesells' second assignment of error presents the issue of what rights an individual partner has in partnership assets under Ohio law, we have chosen to combine our discussions of the first and second assignments of error.

In his judgment entry, the trial judge stated as follows:

"[T]he facts demonstrate that Paul personally owned the collateral pledged as security for each loan made. Even the one-half interest in 350 sows, 15 boars, and 1,000 fat hogs, which were pertnership [*sic*] assets, are considered personal property of a partner. O.R.C. 1775.25. See also *Fairway Development Company* v. *Little Insurance Company of Minnesota,* 621 F. Supp. 120, 123-24 (D.C. Ohio 1985) ('Fairway'). As such, Paul had an interest which he could pledge or assign without giving up his management perogatives [*sic*] or cause the partnerhsip [*sic*] to be dissolved. O.R.C. 1775.26, see *Fairway,* op. cit. Furthermore, it is only reasonable for this Court to find that Bob could or should have had knowledge of Paul's pledging his personal one-half interest in the partnership (See O.R.C. 1775.11) since as father and son they worked side by

side on a daily basis in a farming operation which they had been involved in as a family for a number of years and which was worth roughly half a million dollars in toto."

In their first and second assignments of error, the Mikesells contend that the trial court erred in finding that Paul Mikesell had given Farmers State a valid security interest in hogs owned by Gro-Lean Gilts since an individual partner, acting without authorization, may not assign his interest in partnership assets as security for his personal debts. Therefore, according to the Mikesells, the trial court erred in holding that Farmers State is entitled to possession of hogs presently owned by Mikesell Brothers Farm. We agree.

We base our conclusion on several provisions of the Uniform Partnership Act (enacted in Ohio as R.C. Chapter 1775) which define the nature of the relationship between individual partners and assets of the partnership.

R.C. 1775.23 (Section 24 of the Uniform Partnership Act ["UPA"]) provides that "[t]he property rights of a partner are his rights in specific partnership property, his interest in the partnership, and his right to participate in the management." R.C. 1775.25 (UPA Section 26) states that "[a] partner's interest in the partnership is his share of the profits and surplus, and the same is personal property." Finally, R.C. 1775.24 (UPA Section 25) provides in pertinent part as follows:

"(A) A partner is coowner with his partners of specific partnership property holding as a tenant in partnership.

"(B) The incidents of this tenancy are such that:

"(1) *A partner, subject to sections 1775.01 to 1775.42 of the Revised Code, and to any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess the property for any other purpose without the consent of his partners.*

"(2) *A partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all the partners in the same property.*

"(3) A partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership. When partnership property is attached for a partnership debt, the partners, or any of them, or the representatives of a deceased partner, cannot claim any right under exemption laws." (Emphasis added.)

It is clear from the official comments to this section that a tenancy in partnership is distinct from both a joint tenancy and a tenancy in common. In addition, the official comments state as follows:

"Subdivision (2-b) [R.C. 1775.24(B)(2)] Clause (b)[2] asserts that the right of a partner as co-owner in specific partnership property is not separately assignable. This peculiarity of tenancy in partnership is a necessary consequence of the partnership relation. If A and B are partners and A attempts to assign all his right in partnership property, say a particular chattel, to C, and the law recognizes the possibility of such a transfer, C would pro tanto become a partner with B; for the rights of A in the chattel are to possess the chattel for a partnership purpose. But partnership is a voluntary relation. B cannot have a partner thrust upon him by A without his, B's, consent.

"A cannot confer on C his, A's, right to possess and deal with the chattel for a partnership purpose. Neither can he confer any other rights which he has in the property. A partner has a beneficial interest in partnership property considered as a whole. As profits accrue, he has a right to be paid his

proportion, and on the winding up of the business, after the obligations due third persons have been met, he has a right to be paid in cash his share of what remains of the partnership property. These rights considered as a whole are his interest in the partnership; and this beneficial interest he may assign in whole or fractional part, as is indicated in section 27 [R.C. 1775.26], infra. In a sense, each partner, having thus a beneficial interest in the partnership property considered as a whole, has a beneficial interest in each part, and such beneficial interest might be regarded as assignable if it were not impossible, except by purely arbitrary and artificial rules, to measure a partner's beneficial interest in a specific chattel belonging to the partnership, or any other specific portion of partnership property."

The only Ohio case we have found that addresses the issue of a partner's ability to assign his interest in partnership assets is *Buckman* v. *Goldblatt* (1974), 39 Ohio App. 2d 1, 68 O.O. 2d 69, 314 N.E. 2d 188. In that case, the creditor of a member of a partnership obtained a judgment against the debtor-partner. The creditor then brought a foreclosure action to enforce a lien imposed on the partner's undivided interest in partnership real estate. The debtor and his partners appealed from the trial court's denial of their motion to vacate the judgment. The Court of Appeals for Cuyahoga County, after quoting R.C. 1775.24 and 1775.25, held:

"The consequence of these statutory enactments is to immunize partnership assets against direct attachment or levy, *cf. Farm Bureau* v. *Dicke* (1972), 29 Ohio App. 2d 1, 2, 5 and thus, by implication, from liens.

"The immunization purpose is assisted and emphasized by the definition in R.C. 1775.25, of an individual partner's interest. It follows that appellants had a good defense to the foreclosure action against 'specific partnership property.' Assignments of error 1-4 are well taken and the motion to vacate under Civ. Rule 60(B)(5) should have been granted. * * *" (Footnote omitted.) 39 Ohio App. 2d at 2-3, 68 O.O. 2d at 70-71, 314 N.E. 2d at 189-190.

In a footnote to its opinion, the appellate court made the following observation:

"The full text of R.C. 1775.24(A) and (B) demonstrates a clear legislative intention to put partnership assets outside the reach of any claim that requires establishment through the individual partner, whether by assignment, judgment, exemption, or the operation of probate or family law, unless specifically permitted by statute, *e.g.* R.C. 1775.24(B)(4) and R.C. 1775.27." *Id.* at fn. 6.

The *Buckman* court reversed the trial court's decision, holding that the levy and foreclosure were contrary to law. The court concluded that the only means by which a creditor may reach a partner's interest in partnership assets is through a charging order obtained pursuant to R.C. 1775.27 (UPA Section 28).[8]

---

[8] R.C. 1775.27 provides in pertinent part as follows:

"(A) On due application to a competent court by any judgment creditor of a partner, the court which entered the judgment, order, or decree, or any other court, may charge the interest of the debtor partner with payment of the unsatisfied amount of such judgment debt with interest thereon; and may then or later appoint a receiver of his share of the profits, and of any other money due or to fall due to him in respect of the partnership, and make all other orders, directions, accounts, and inquiries which the debtor partner might have made, or which the circumstances of the case may require."

The holding in *Buckman, supra,* is in accordance with decisions from other states that have adopted the Uniform Partnership Act. See, generally, Annotation, Construction, Application, and Effect of Uniform Partnership Act, Section 25(2)(b), Relating to Nonassignability of Partner's Right in Specific Partnership Property (1955), 39 A.L.R. 2d 1365. The rule we derive from these cases is that a partner's interest in the partnership, his right to share in profits and surplus, is assignable. However, a partner may not assign his interest in particular assets of the partnership.[9] If the creditor of an individual partner has obtained a judgment against a partner, his sole means of attaching the partner's interest in the partnership is the charging order provided for in R.C. 1775.27 (UPA Section 28).[10]

It is clear that under the Uniform Partnership Act, an individual partner may not pledge his interest in partnership assets as security for his personal debts. Therefore, the security agreement between Paul Mikesell and Farmers State was ineffective to give the bank a security interest in hogs owned by Gro-Lean Gilts.

R.C. 1775.03 (UPA Section 4) provides that the law of agency and the law of estoppel continue to apply under the Uniform Partnership Law. In addition, R.C. 1775.08(A) (UPA Section 9) states that "[e]very partner is an agent of the partnership for the purpose of its business, and the act of every partner * * * for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership * * *." However, in this case, it is clear from the record that when Paul Mikesell borrowed money from Farmers State, he was acting in his individual capacity and not as a partner in Gro-Lean Gilts.

We also do not believe that the Mikesells should be estopped from denying that Paul Mikesell had authority to act on their behalf. The doctrine of "agency by estoppel" is usually applied in those cases where credit has been extended, action has been induced, delay has been obtained, or some other change in position has occurred, in reliance upon the appearance of authority. *Johnson* v. *Wagner Provision Co.* (1943), 141 Ohio St. 584, 590-591, 26 O.O. 161, 164, 49 N.E. 2d 925, 928. In this case, there is no indication in the record that Farmers State made the loans to Paul Mikesell based upon representations by Bob Mikesell or any other member of the Mikesell family that Paul Mikesell was acting in his capacity as a partner in Gro-Lean Gilts or that the partnership would be responsible for the debt. Since the record does not show that Farmers State made the loan to Paul Mikesell because it had been induced to believe that he was acting as the agent of Gro-Lean Gilts, we do not believe that estoppel applies to this case.

Finally, we do not believe that it can be said that the Mikesells ratified

---

[9] Although a partner's assignment of his interest in partnership property is ineffective as an assignment of his interest in specific partnership property, it may be valid as an assignment of his partnership interest. See *In re Decker* (W.D. Va. 1969), 295 F. Supp. 501, 511. In the present case, there has been no contention that Paul Mikesell's assignment to Farmers State was an assignment of his right to share in the profits and surplus of Gro-Lean Gilts.

[10] Although there is agreement among states that have adopted the Uniform Partnership Act that the charging order is virtually the exclusive remedy for a creditor of an individual partner who wishes to attach the partner's interest in the partnership, there is some confusion as to how a charging order, once obtained, is to be applied. See Axelrod, The Charging Order — Rights of a Partner's Creditor (1982), 36 Ark. L. Rev. 81.

the actions of Paul Mikesell. "It is well established that a principal may ratify the acts of his agent performed beyond the agent's authority; and such ratification extends back to the doing of the unauthorized act by the agent and binds the principal from that time. * * *" (Citations omitted.) *State, ex rel. Riley Constr. Co.,* v. *East Liverpool Bd. of Edn.* (1967), 10 Ohio St. 2d 25, 29, 39 O.O. 2d 15, 18, 225 N.E. 2d 246, 249. "To establish ratification under Ohio law, one must show action by the principal, taken with full knowledge of the facts, which manifests his intention to adopt the unauthorized transaction." *Thropp* v. *Bache Halsey Stuart Shields, Inc.* (C.A. 6, 1981), 650 F. 2d 817, 822. In this case, there is no indication that the other members of the Mikesell family had knowledge of Paul Mikesell's borrowing from Farmers State. Moreover, we find no evidence in the record of actions taken by Bob Mikesell or any other members of the Mikesell family which could be said to manifest an intention on their part to adopt the loan transaction between Paul Mikesell and Farmers State.

In conclusion, we hold that Paul Mikesell's purported pledge did not give Farmers State a security interest in assets owned by Gro-Lean Gilts. Consequently, the trial court erred in holding that Farmers State had a lien on the livestock and could take possession.

The first and second assignments of error are sustained.

### III

The Mikesells' third assignment of error is as follows:

"The trial court committed reversible error in issuing a judgment entitling the plaintiff to recover an International Harvester tractor when the complaint seeking said tractor was filed after the time allotted by the statute of limitations had expired."

In their third assignment of error, the Mikesells contend that the trial court erred in holding that Farmers State was entitled to possession of the 1973 International Harvester tractor, since Farmers State's action to recover the tractor was not timely brought. The Mikesells claim, and Farmers State does not dispute, that the bank's action to recover the tractor was subject to the time limitation set forth in R.C. 2305.09. In pertinent part, that statute provides as follows:

"An action for any of the following causes shall be brought within four years after the cause thereof accrued:

"* * *

"(B) For the recovery of personal property, or for taking or detaining it;

"* * *

"If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."

The Mikesells' first argument under this assignment of error is that Farmers State's action to recover the tractor accrued on May 12, 1980, when Paul Mikesell sold the tractor to Mikesell Brothers Farm in violation of his security agreement with the bank. Therefore, according to the Mikesells, since Farmers State did not file a complaint in this matter until October 17, 1985, its action to recover the tractor is untimely.

However, although a cause of action may have arisen in favor of Farmers State at the time Paul Mikesell sold the tractor to Mikesell Brothers Farm, we note that Bob Mikesell testified at trial that at the time of the sale no one in the Mikesell family had informed Farmers State that ownership of the tractor had changed. In addition, David Shives of Farmers State testified at trial that he often drove past the Mikesell farm and

frequently saw members of the Mikesell family using the tractor apparently in the ordinary course of their farming business. Therefore, since there was nothing to give Farmers State actual notice that the tractor had been wrongfully transferred at the time Paul Mikesell sold the tractor to Mikesell Brothers Farm, the statute of limitations found in R.C. 2305.09 did not start to run at that time.

The Mikesells' second argument is that even if Farmers State's cause of action did not accrue at the time Paul Mikesell sold the tractor to Mikesell Brothers Farm, the bank's action to recover the tractor was nonetheless untimely. The Mikesells reason that even if the limitation period set forth in R.C. 2305.09 did not start to run at the time of the sale, it was delayed only until Farmers State received constructive notice of the sale. Therefore, according to the Mikesells, Farmers State's action was untimely since the bank should be charged with knowledge of the sale as of December 1980.

During the period from 1975 to 1982 (excluding 1976), Paul Mikesell submitted a series of yearly financial statements to Farmers State. In one of these financial statements, dated July 13, 1979, Paul Mikesell listed the following assets: twenty-two beef cows, twenty calves, one bull, one-half of Gro Lean Gilts, ten thousand bushels of corn, $1,800 cash, an automobile, a truck, and machinery valued at $15,000. In the itemized machinery schedule on the back of the financial statement, Paul Mikesell listed one item of machinery, an "IHC" tractor. The parties do not dispute that the tractor Paul Mikesell listed in his 1979 financial statement was the same one

that he pledged to Farmers State on November 23, 1979.

In the next financial statement Paul Mikesell gave to Farmers State, dated December 14, 1980, he listed the following assets: twenty beef cows, eleven calves, one bull, one-half Gro-Lean Gilts, real estate, and two automobiles. Machinery was not listed as an asset. In addition, there was nothing listed in the machinery schedule on the back of the statement.

In a financial statement Paul Mikesell prepared for Farmers State on March 24, 1981, he listed $86,878 worth of machinery as an asset. Among the items listed in the machinery schedule was a one-third interest in a "1466 Int." tractor.[11]

David Shives testified at trial that, when evaluating a loan application, it was his practice to review the applicant's financial statements for the preceding years. According to Shives, when Paul Mikesell applied for a loan from Farmers State in December, 1980, he would have compared the financial statement Paul Mikesell submitted at that time to his prior financial statements, including the 1979 statement described above. The Mikesells argue that had Shives examined Paul Mikesell's financial statement and compared it to his 1979 financial statement, as he testified it was his custom to do, then Farmers State would have been effectively put on notice in December 1980 that the 1973 International Harvester tractor had been wrongfully transferred. Therefore, according to the Mikesells, Farmers State's cause of action accrued and the limitation period set forth in R.C. 2305.09 began to run in December 1980. We agree.

---

[11] The tractor Paul Mikesell pledged to Farmers State is described in the security agreement as a "1973 International 1466" tractor. It seems reasonable to conclude that the tractor Paul Mikesell listed in the machinery schedule of his 1981 financial statement was the same one he had pledged to Farmers State in 1979.

In *Hambleton* v. *R.G. Barry Corp.* (1984), 12 Ohio St. 3d 179, 12 OBR 246, 465 N.E. 2d 1298, the Ohio Supreme Court stated that notice of a wrongful taking of property may be constructive as well as actual. According to the court, a cause of action accrues and the statute of limitations set forth in R.C. 2305.09 starts to run when a person possesses knowledge sufficient to lead a reasonably prudent person to make inquiry, and such inquiry would have led to the discovery of the alleged wrongful taking. *Id.* at 181-182, 12 OBR at 248-249, 465 N.E. 2d at 1300-1301.

When a debtor pledges property to his creditor as security for a loan in one year and the property does not appear in a financial statement the debtor submits to the same creditor the following year, a reasonably prudent commercial lender would be put on notice that further inquiry is necessary. In this case, if Farmers State had conducted even a minimal inquiry at the time that it received Paul Mikesell's 1980 financial statement, it would have discovered that Paul Mikesell had sold the tractor in violation of his security agreement with the bank. Since Farmers State would have acquired knowledge of the sale through the exercise of reasonable prudence in December 1980, the cause of action to recover the tractor accrued at that time. Consequently, since Farmers State did not file its first complaint in this matter until October 1985, its action was not timely under R.C. 2305.09.

The third assignment of error is sustained.

## IV

The Mikesells' fourth assignment of error is as follows:

"The description of the collateral set forth in the security agreement was insufficient to create a valid security interest in the hogs."

In their fourth assignment of error, the Mikesells contend that the trial court erred in holding that Farmers State is entitled to possession of livestock presently owned by Mikesell Brothers Farm since, according to the Mikesells, the security agreement signed by Paul Mikesell and the financing statement filed in the Darke County Recorder's office were ineffective to give the bank a perfected security interest in the hogs. The Mikesells argue that the description of the collateral set forth in the security agreement and the financing statement was fatally deficient.

Under R.C. 1309.14 (UCC 9-203) a security interest does not attach unless the collateral is in the possession of the secured party or the debtor has signed a security agreement which contains a description of the collateral. Under R.C. 1309.22 (UCC 9-303), a security interest is perfected when it has attached and when all of the steps required for perfection have been taken. R.C. 1309.21 (UCC 9-302) states that with certain exceptions, a financing statement must be filed to perfect all security interests. Under R.C. 1309.39 (UCC 9-402), "[a] financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral."

R.C. 1309.08 (UCC 9-110) sets forth the test for sufficiency of the description of collateral in both a security agreement and a financing statement. Under that section, "* * * any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

However, it should be kept in mind

that the security agreement and the financing statement serve different functions. The financing statement is intended to put third parties on notice that a security interest possibly exists and that further inquiry may be necessary. On the other hand, the security agreement creates the security interest and establishes as between the debtor and the secured party what property was intended to be subject to the security interest. Some courts have taken the position that as a result of these different functions, more specificity is required in descriptions of collateral in security agreements than in financing statements. See *World Wide Tracers, Inc.* v. *Metropolitan Protection, Inc.* (Minn. 1986), 384 N.W. 2d 442; *American Restaurant Supply Co.* v. *Wilson* (Fla. App. 1979), 371 So. 2d 489.

In this case, the Mikesells argue that the description of the collateral in the security agreement between Paul Mikesell and Farmers State was insufficient to give the bank a security interest in hogs owned by Gro-Lean Gilts. According to the Mikesells, the description of collateral was deficient in that it failed to specify which hogs were covered by the security agreement.

The description of collateral in the security agreement may aptly be characterized as "underfocused," since it does not indicate whether Farmers State intended to take a security interest in specific hogs owned by Gro-Lean Gilts, or in any hogs that were part of the Gro-Lean Gilts herd. See White & Summers, Uniform Commercial Code (2 Ed. 1980) 910-911, Section 23-3. However, we conclude that the language was sufficiently definite to satisfy the requirements of R.C. 1309.08 (UCC 9-110) and R.C. 1309.14 (UCC 9-203).

We find support for this position in two cases. In *United States* v. *Mid-States Sales Co.* (D. Neb. 1971), 336 F. Supp. 1099, the defendant Mid-States Sales Company sold twenty-four Holstein heifers to the debtor and then took a purchase money security interest in the livestock. The purchase money mortgage described the collateral as "twenty four (24) Holstein heifers with increase." The United States District Court for Nebraska held that while this collateral description was not so inexact as to render the security instrument defective, it was sufficiently uncertain, where other Holstein cattle were owned by the debtor, to place a substantial burden upon the purchase money mortgagee to be able to clearly identify its collateral in order to gain priority over the Farmers Home Administration which held a general lien on the same livestock. *Id.* at 1102. In *Raasch* v. *Tri-County Trust Co.* (Mo. App. 1986), 712 S.W. 2d 5, a Missouri appellate court held that although a security agreement listing hogs as collateral and describing the hogs by breed and number of hogs was sufficient to give a hog dealer a security interest, the hog dealer had the burden of showing that another creditor had converted the hogs that were subject to his interest. *Id.* at 7-8.

The Mikesells also argue that Farmers State does not have a security interest in hogs owned by Mikesell Brothers Farm since, by its terms, the security agreement between Paul Mikesell and the bank covered only hogs located on Paul Mikesell's property at 2449 Harrison Road. According to the Mikesells, since hogs owned by Gro-Lean Gilts and Mikesell Brothers Farm have always been kept at the Mikesell family farm on Stephens Road, they were never subject to Farmers State's security interest.

The security agreement between Paul Mikesell and Farmers State consists of a preprinted form provided by Farmers State. There are a number of

blank spaces in this form for filling in information pertinent to the particular transaction. At the top of this form, there is a space for the debtor's name and address. In this case, Paul Mikesell's name and his address, 2449 Harrison Road, were typed in this space. After the space for the debtor's name and address, the form contains language granting the creditor a security interest and then a space for a description of the collateral. Further down in the security agreement, the following language appears:

"Debtor hereby warrants and covenants:

"* * *

"2. That the collateral shall be kept at the following address _____, * * *"

In this case, the word "same" was typewritten in the blank space.

The Mikesells argue that the provision quoted above limited Farmers State's security interest to those hogs kept at 2449 Harrison Road. Therefore, according to the Mikesells, Farmers State did not have a security interest in their hogs which were located on Stephens Road.

However, as we read the language quoted above, it was not part of the description of collateral but rather was a separate promise by Paul Mikesell to keep the collateral at a particular location. As such, this provision did not limit Farmers State's security interest. *First Natl. Bank & Trust Co. of Oklahoma City* v. *Atchinson Cty. Auction Co.* (1985), 10 Kan. App. 2d 382, 699 P. 2d 1032. Moreover, even if the provision quoted above were properly construed as being part of the description of collateral, there is authority that a designation of location in a description of collateral will not necessarily limit the creditor's security interest to collateral kept at the specified location. *In re Lee* (Bankr. Ct. E. D. Tenn. 1981), 14 B.R. 804, 32

UCC Rep. Serv. 580. But, see, *First Natl. Bank of Glasgow* v. *First Sec. Bank of Montana, N.A.* (1986), 222 Mont. 118, 721 P. 2d 1270.

The Mikesells also appear to argue that the financing statement filed by Farmers State was insufficient to perfect the bank's security interest. We agree.

As discussed previously, the purpose of the financing statement is to provide third parties with notice that a security interest exists and to give the third party enough information to conduct further inquiry and discover the nature and extent of the security interest. Under R.C. 1309.39 (UCC 9-402), one of the requirements of a financing statement is that it give the name of the debtor.

In this case, the financing statement filed by Farmers State listed Paul Mikesell as the debtor and was apparently filed under Paul Mikesell's name. However, as discussed previously, Paul Mikesell did not own the hogs individually but rather was a co-owner with Bob Mikesell of property held by Gro-Lean Gilts. In our opinion, filing under Paul Mikesell's name alone was insufficient to perfect the security interest at least as against third parties, since a third party seeking to ascertain the lien status of assets owned by Gro-Lean Gilts or Mikesell Brothers Farm would not have been put on notice by a search of the records in the Darke County Recorder's office.

In conclusion, if Paul Mikesell had been able to give Farmers State a security interest in hogs owned by Gro-Lean Gilts, the description of the collateral in the security agreement would have been sufficient under R.C. 1309.14. However, Farmers State's interest would not have been perfected by the financing statement filed in the Darke County Recorder's office, at least as against third parties such as defendants-appellants.

The fourth assignment of error is overruled as to the security agreement; however, as to the financing statement, we conclude that it was insufficient under R.C. 1309.39.

## V

The Mikesells' fifth assigment of error is as follows:

"A judgment ordering replevin of existing livestock or a money award is unsupported by the record."

In their fifth assignment of error, the Mikesells contend that the trial court erred in holding that Farmers State is entitled to possession of livestock currently held by Mikesell Brothers Farm since the record is clear that the hogs now located on the Mikesell farm are not the same hogs and are not progeny of the hogs that Paul Mikesell pledged to Farmers State in 1980.

During his examination of Bob Mikesell, counsel for Farmers State read from the deposition Bob Mikesell had given on June 3, 1986. The relevant portion of the deposition is set forth below:

"Q. If I understood you correctly, you have though operated I think you said more or less continuously the same number of hogs, that hog operation, since roughly 1975.

"A. That's true.

"* * *

"Q. And with the same hogs, the same sows, the same boars that you had operated under the partnership, right?

"A. True.

"Q. And they or their progeny are the same hogs that are out there today, right?

"A. Progeny."

At the hearing before the trial court, Bob Mikesell gave testimony that it is a standard practice in hog farming to occasionally "depopulate," meaning that existing breeding stock is sold off and replaced. Bob Mikesell testified that he had depopulated during the early 1980s and that, consequently, the hogs on his farm at the time of the hearing were not the same hogs he had owned when he started his operation. Bob Mikesell also testified that in light of this depopulating, the statement he had made in his deposition that hogs then located on the Mikesell farm were progeny of hogs once owned by Gro-Lean Gilts was incorrect.

On appeal, the Mikesells argue that the statements Bob Mikesell made in his deposition were introduced solely for impeachment purposes and are not evidence in this case. The Mikesells contend that the only evidence in this case concerning lineage of the Mikesell Brothers Farm hogs is Bob Mikesell's testimony before the trial court that because of depopulating, hogs now on the Mikesell farm have no biological connection to the hogs Paul Mikesell attempted to pledge to Farmers State. Therefore, according to the Mikesells, since the record demonstrates that they are no longer in possession of hogs or progeny of hogs subject to Farmers State's lien, the trial court erred in holding that Farmers State is entitled to possession of livestock presently owned by Mikesell Brothers Farm.

In essence, the Mikesells argue that if Farmers State acquired security interest in Gro-Lean Gilts livestock, that interest ended once Bob Mikesell depopulated and the progeny of hogs pledged by Paul Mikesell were sold in the ordinary course of business. However, we note that the security agreement in which Paul Mikesell purportedly pledged the hogs to Farmers State states that the debtor grants the secured party a security interest in the described collateral plus "* * * any and all additions, accessions, and

substitutions thereto or therefor."[12] Therefore, if Paul Mikesell had been able to give Farmers State a valid interest in hogs owned by Gro-Lean Gilts, the bank's interest would have continued after the depopulating described by Bob Mikesell. We find support for this position in several cases.

In *Cargill, Inc.* v. *Perlich* (Ind. App. 1981), 418 N.E. 2d 274, an Indiana appellate court held that under Section 26-1-9-108 of the Indiana Code (UCC 9-108), a bank which had taken a security interest in hogs and their "young, products and produce" had a continuing interest in the debtor-farmer's livestock even though it was the debtor's practice to completely sell off and replace his livestock every six months.[13] *Id.* at 278-280.

In *Fairchild* v. *Lebanon Production Credit Assn.* (Bankr. Ct. S.D. Ohio 1983), 31 B.R. 789, 36 UCC Rep. Serv. 655, the debtor-farmer gave his creditor a security interest in "hogs" and "[a]ll property similar to that listed * * * which at any time may hereafter be acquired * * *." Sometime later, the debtor sold off all of his existing livestock and converted from a hog "feeder" operation to a hog "breeder" operation. *Id.* at 792, 36 UCC Rep. Serv. at 657. The bankruptcy court held that the creditor's interest was secured by the replacement hogs. *Id.* at 793, 36 UCC Rep. Serv. at 659. According to the court, to hold otherwise would potentially disrupt routine financing arrangements and possibly encourage debtors to change their methods of operation in order to divest their creditors of collateral. *Id.*

In *In re Fricks* (Bankr. Ct. N.D. Ala. 1986), 58 B.R. 883, 1 UCC Rep. Serv. 2d 269, the debtor signed a security agreement giving his creditor a security interest in his "hog inventory." The financing statement filed by the creditor described the collateral as "eight hundred (800) head of hogs-pigs birth to market size * * *." *Id.* at 885, 1 UCC Rep. Serv. 2d at 270. After noting the constantly changing nature of a herd of livestock, the bankruptcy court held that the security agreement together with the financing statement gave the bank a perfected security interest in hogs owned by the debtor at the time of bankruptcy even if they were not the same hogs present when the parties entered into the security agreement. *Id.* at 886-887, 1 UCC Rep. Serv. 2d at 273-274.

We conclude that the record in this case supports a finding that Farmers State intended to take, and Paul Mikesell intended to give, a continuing interest in after-acquired and substitute collateral. Therefore, if Paul Mikesell had been able to give Farmers State a valid security interest in hogs owned by Gro-Lean Gilts, Farmers State's interest would have continued in hogs acquired after depopulating.

The fifth assignment of error is overruled.

---

[12] In addition, David Shives testified at trial that it had been his understanding, based upon his conversations with Paul Mikesell, that Farmers State was to have a continuing interest in the livestock.

[13] UCC 9-108 appears in the Ohio Revised Code as R.C. 1309.06. That section provides as follows:

"Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property, his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

## VI

The Mikesells' sixth assignment of error is as follows:

"The judgment is uncertain in its breadth and overly broad if applied to all defendants."

In their sixth assignment of error, the Mikesells contend that the trial court's entry of judgment in this case is overly broad and uncertain since it fails to provide guidance as to which of the Mikesells had judgment rendered against him.

"Where a person is wrongfully injured at the hands of two or more persons acting in concert, or acting independently but *concurrently* in causing a single injury, each of the wrongdoers is severally liable to such person for the full amount of the damage occasioned thereby; and the person injured may enforce his claim therefor in an action against all of them jointly, any one of them severally, or any number of them less than the whole." (Emphasis *sic.*) *Larson* v. *Cleveland Ry. Co.* (1943), 142 Ohio St. 20, 32, 26 O.O. 228, 233, 50 N.E. 2d 163, 170. If a plaintiff has a single cause of action against several tortfeasors, he is entitled to a joint judgment against those tortfeasors. However, "[a] joint judgment against two or more tort-feasors is proper only where, because of their relationship, concert of action, or independent but concurrent action, each is vicariously responsible for the wrongful acts of the other or others to the extent of the entire damage done." *Id.* at 33, 26 O.O. at 233, 50 N.E. 2d at 170.

In the present case, Farmers State alleged in its amended complaint that the Mikesell family members, as individuals and as members of the family partnerships, had engaged in fraudulent transfers of Paul Mikesell's assets in an effort to prevent Farmers State from recovering its collateral. Consequently, since the trial court found in favor of Farmers State, albeit incorrectly, the court did not err in entering a joint judgment.

Since the ultimate goal of litigation is the obtainment and enforcement of a judgment, the judgment itself must be certain, definite, and sufficient in itself. "[T]he judgment must so dispose of the matters at issue between the parties that they, and such other persons as may be affected, will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined." 62 Ohio Jurisprudence 3d (1985) 352-353, Judgments, Section 27, and cases cited therein. In this case, the trial court stated in its judgment entry that Farmers State is entitled to possession of the International Harvester tractor and a one-half interest in certain livestock held by Mikesell Brothers Farm. In the alternative, the trial court granted Farmers State judgment in the amount of $31,103.13 plus interest. This judgment, even though we have concluded that it was erroneous for the reasons set forth in Parts II, III, and IV of this opinion, was sufficiently definite.

The sixth assignment of error is overruled.

## VII

The Mikesells' seventh assignment of error is as follows:

"The court's order that the defendant pay the plaintiff's attorney fees is contrary to the law of Ohio."

In its judgment entry, the trial court stated as follows:

"The Court finds the facts do not support a claim of fraud and, therefore, punitive damages are denied. However, the Court does award the Plaintiff reasonable attorney fees and costs of this action."

Ohio follows the generally prevailing "American rule" that absent a statute or contractual provision allowing recovery of attorney fees, a party is not entitled to an award of attorney

fees. *Sorin* v. *Bd. of Edn.* (1976), 46 Ohio St. 2d 177, 179, 75 O.O. 2d 224, 225, 347 N.E. 2d 527, 528-529. See, also, *Nottingdale Homeowners' Assn., Inc.* v. *Darby* (1987), 33 Ohio St. 3d 32, 514 N.E. 2d 702. However, Ohio law recognizes an exception to this rule when the party against whom attorney fees are sought to be taxed is found to have acted "* * * in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons." *Sorin* v. *Bd. of Edn., supra,* at 181, 75 O.O. 2d at 226, 347 N.E. 2d at 530. See, also, *State, ex rel. Crockett,* v. *Robinson* (1981), 67 Ohio St. 2d 363, 21 O.O. 3d 228, 423 N.E. 2d 1099; *State, ex rel. Kabatek,* v. *Stackhouse* (1983), 6 Ohio St. 3d 55, 6 OBR 73, 451 N.E. 2d 248. In addition, it is well-established that in the case of a tort involving elements of fraud, malice, or insult where it is determined that punitive damages are warranted, attorney fees may also be awarded as compensatory damages. *Roberts* v. *Mason* (1859), 10 Ohio St. 278, 281. See, also, *Automotive Appearances, Inc.* v. *Culpepper* (Nov. 7, 1986), Montgomery App. No. CA 9566, unreported. However, attorney fees may not be recovered in such a case unless the circumstances justify an award of punitive damages. *United Power Co.* v. *Matheny* (1909), 81 Ohio St. 204, 90 N.E. 154; *New York, Chicago & St. Louis Rd. Co.* v. *Grodek* (1933), 127 Ohio St. 22, 186 N.E. 733.

In this case, we agree with the Mikesells that their interposition of defenses to Farmers State's claims did not amount to bad faith or obdurate conduct. In addition, we find nothing in the record to indicate that the Mikesells acted with malice towards Farmers State. In order to justify an award of punitive damages on the basis of malice, it must be shown that the defendant acted out of ill will or with a conscious disregard for the rights and safety of others. *Preston* v. *Murty* (1987), 32 Ohio St. 3d 334, 512 N.E. 2d 1174. In our opinion, the sale of Paul Mikesell's property to the other members of his family and the family partnerships does not establish malice on the part of the Mikesells (previously defined as excluding Paul Mikesell). We do not believe that these acts, standing alone, establish ill will or a conscious disregard of Farmers State's rights.

Moreover, we do not conclude that the acts of the Mikesells constituted a fraudulent conveyance under R.C. 1336.04. R.C. 1336.04 provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." In *Sease* v. *John Smith Grain Co.* (1984), 17 Ohio App. 3d 223, 17 OBR 489, 479 N.E. 2d 284, this court stated that "[i]n order to establish a fraudulent conveyance under R.C. 1336.04 * * * a creditor must prove that the debtor was insolvent or would be made so by the transfer in issue and that the transfer was made without fair consideration. If both of these burdens are met, the transfer is fraudulent as a matter of law. Neither the intent of the debtor nor the knowledge of the transferee need by proven." (Citation omitted.) *Id.* at 225, 17 OBR at 492, 479 N.E. 2d at 288.

In this case, there is no evidence that Paul Mikesell was insolvent or would have been made so by the transfer of his interest in Gro-Lean Gilts to Bob Mikesell. We note that Paul Mikesell did not file for bankruptcy until several years after he had withdrawn from Gro-Lean Gilts. Also, we cannot say that Bob Mikesell's agreement to forgive certain debts was inadequate consideration for Paul Mikesell's interest in Gro-Lean Gilts

since the amount of those debts does not appear in the record. In addition, there is nothing in the record to indicate that $14,000 was not fair consideration for the International Harvester tractor.

Since we have found no support in the record for a finding that the Mikesells acted fraudulently or with malice toward Farmers State, we conclude that the trial court erred in awarding attorney fees to the bank.

The seventh assignment of error is sustained.

## VIII

In conclusion, we hold that Paul Mikesell had no authority to assign his interest in partnership assets as security for his individual debts. His attempt to do so did not create a security interest in favor of his creditor in those assets. Therefore, the trial court erred in holding that Farmers State is entitled to possession of livestock pledged by Paul Mikesell as security for his personal debt.

We also hold that the trial court erred in awarding possession of the International Harvester tractor to Farmers State since the bank's action to recover this property was not timely brought.

Finally, we hold that the record in this case does not support an award of attorney fees to Farmers State.

The decision of the trial court remains in effect against defendants Paul Mikesell and Gro-Lean Gilts of Ohio (who did not appeal); in all other respects, the judgment of the trial court is reversed, and judgment is entered in favor of defendants-appellants Bob Mikesell, Kent Mikesell, Bruce Mikesell, Mikesell Brothers Farm and Juanita Mikesell.

*Judgment reversed.*

BROGAN, J., concurs.

KERNS, P.J., concurs in part and dissents in part.

KERNS, P.J., concurring in part and dissenting in part. Where property is wrongfully transferred in violation of a security agreement, I cannot agree that its subsequent omission from a typical financial statement constitutes constructive notice so as to trigger the running of the statute of limitations. For this reason, I would overrule the third assignment of error.