**LEAL et al., Appellees and Cross–Appellants,**

v.

**HOLTVOGT et al., Appellants and Cross–Appellees.**

[Cite as *Leal v. Holtvogt* (1998), 123 Ohio App.3d 51.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 97–CA–20.

Decided Aug. 7, 1998.

52

54

58

*Todd D. Severt,* for appellees and cross-appellants.

*Mark R. Chilson,* for appellants and cross-appellees.

---

FAIN, Judge.

Defendants-appellants and cross-appellees Joseph D. and Claudia Holtvogt appeal from a judgment awarding compensatory damages to plaintiffs-appellees and cross-appellants Mary and Ferdinand Leal. The Leals cross-appeal from that part of the judgment awarding compensatory damages, punitive damages, and attorney fees to the Holtvogts.

This appeal involves a sale by the Holtvogts to the Leals of a one-half interest in an Arabian stallion named Mc Que Jabask. The Holtvogts contend that they neither negligently misrepresented the condition of the stallion nor gave the Leals an express warranty regarding the stallion. Further, they argue that the damage award against them is against the manifest weight of the evidence. The Holtvogts also argue that under the agreement the Leals should be required to pay for half of all the costs expended for Mc Que Jabask before his death. Finally, they argue that the trial court did not award them adequate attorney fees.

The Leals contend that the Holtvogts fraudulently misrepresented the condition of the stallion and that, because of this fraud, they should receive punitive damages and attorney fees. They also argue that Mrs. Leal did not defame Mr. Holtvogt.

We conclude that the record supports the trial court's award of compensatory damages to the Leals. Further, we conclude that there is evidence in the record to support the trial court's award of punitive damages and attorney fees to the Holtvogts. We also conclude that the amount of compensatory damages awarded to the Holtvogts by the trial court was supported by the record. Finally, we conclude that both the Holtvogts and the Leals may be entitled to further compensatory damages.

Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded for further proceedings.

## I

Joseph and Claudia Holtvogt owned and operated Shady Glen Arabians, a horse barn in Miami County, Ohio. They were experienced in Arabian horse training, breeding, boarding, selling, and showing. In 1992, the Leals, novices in the equine industry, decided to begin raising horses. In April 1993, Ferdinand

Leal began visiting Shady Glen Arabians regularly to learn how to ride and handle horses. Before long, a friendship developed between the Holtvogts and Leals, and Ferdinand Leal began spending three to four days each week at the Holtvogts' barn helping Joseph Holtvogt with the horses.

In late 1993, the Leals decided they wanted to start a breeding program by purchasing a stallion to breed with a mare they owned. At first, they were interested in purchasing Procale, a stallion owned by John Bowman. After talking to Mr. Holtvogt about Procale, the Leals decided not to buy him. The Holtvogts then offered the Leals a one-half interest in Mc Que Jabask, an Arabian stallion that the Holtvogts owned. At trial, the Leals testified that before they agreed to invest in Mc Que Jabask, Mr. Holtvogt made a number of statements regarding the stallion, such as Mc Que Jabask was a national top-ten champion in three categories; he was an all-around winning stallion; he earns $20,000 per year in stud fees; he is capable of attaining national show titles again; and his foals were selling for $6,000 to $10,000 each (these statements will be referred to hereinafter as "the five contested statements").

In January 1994, the Leals and Holtvogts entered into a contract of sale for a one-half interest in Mc Que Jabask for $16,000. The contract also established a partnership agreement, which called for the parties to share equally in the expenses and profits arising from their joint ownership of Mc Que Jabask.

There was expert testimony that prior to January 1994, Mc Que Jabask had been treated for lameness and was suffering a chronic lameness condition in his right rear and fore fetlocks. Mr. Holtvogt testified that he had taken the stallion for lameness treatments numerous times. He also stated that he did not disclose this information to the Leals.

By July 1994, the Leals were dissatisfied with the partnership and indicated to the Holtvogts that they wanted either a refund of their money or a remedy for their concerns. In March 1995, the mortality insurance on Mc Que Jabask lapsed when neither the Leals nor the Holtvogts paid the insurance premium.

Mary Leal, a former Dayton police officer, was unhappy with the partnership. She began making disparaging remarks about Joseph Holtvogt's honesty and integrity to the past and present customers of Shady Glen Arabians. As a result of these remarks, Joseph Holtvogt testified that he suffered from depression, had visited some medical doctors, and was on medication. The Holtvogts did stipulate, however, that they could not prove any business or economic damages due to Mary Leal's remarks.

On January 17, 1996, Mc Que Jabask died from stomach ulcer complications. Since neither party had renewed the stallion's mortality insurance, Mc Que Jabask was uninsured.

In February 1995, the Leals filed suit against the Holtvogts, who then brought counterclaims against the Leals. The Miami Country Common Pleas Court found that the Holtvogts had negligently misrepresented the stallion's condition and that they had breached an "express warranty on the condition of the horse for the purposes intended" and awarded the Leals $16,000 in compensatory damages. The court further found that the Leals had four of their own horses boarded at the Holtvogts' barn and that the Leals had failed to pay for their care and upkeep. Thus, the trial court awarded the Holtvogts $800.23 in compensatory damages for the services they had provided for these four horses. The court also found that Mary Leal slandered Joseph Holtvogt and, after concluding that Mr. Holtvogt's damages were minimal to nominal, awarded him $1,000 in compensatory damages. Finding Mary Leal's statements to have been made with malice, the court also awarded the Holtvogts punitive damages and attorney fees of $1,000. The $1,000 award for punitive damages and attorney fees was vacated by the trial court after the parties reminded the court that it had been stipulated that there would be an additional hearing to present evidence for attorney fees if the court found that punitive damages were appropriate. After this additional hearing, the trial court awarded the Holtvogts $3,000 for punitive damages and attorney fees. Both the Holtvogts and the Leals appeal from the judgment of the trial court.

## II

The Holtvogts' second assignment of error is as follows:

"The trial court committed reversible error when it held that defendants' actions constituted negligent misrepresentation because plaintiffs failed to present any factual evidence whatsoever which would lead a reasonable person to believe that Mc Que Jabask was lame at the time the parties entered into the partnership agreement or that Mc Que Jabask was not fit to be shown."

The Holtvogts contend that the Leals failed to establish the requisite elements for a claim of negligent misrepresentation and that the trial court's conclusion is against the manifest weight of the evidence and contrary to law for two reasons. First, they argue that the expert testimony in the record does not establish that Mc Que Jabask was lame at the time the parties entered into the agreement. Second, they argue that the trial court's conclusion that the stallion was not fit to be shown is against the manifest weight of the evidence because there is no proof that the stallion could not be shown and that, even if he was not able to be shown, this inability would not have affected his ability to earn stud fees.

We begin by addressing the issue of whether the Holtvogts negligently misrepresented the condition of Mc Que Jabask when they failed to disclose his lameness. Whether Mc Que Jabask was lame at the time of the agreement was

hotly contested at trial, with both sides presenting expert testimony from veterinarians and introducing numerous exhibits ranging from x-rays to a videotape. The trial court concluded that the Holtvogts had negligently misrepresented the stallion's condition by failing to inform the Leals that he suffered from chronic lameness. We conclude that, regardless of the evidence presented, the Holtvogts could not have made a negligent misrepresentation by failing to disclose to the Leals that Mc Que Jabask suffered from lameness.

"Negligent misrepresentation" is defined as follows:

■ " '[One] who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information* for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " (Emphasis *sic*.) *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269, discretionary appeal not allowed (1997), 78 Ohio St.3d 1425, 1425, 676 N.E.2d 531, quoting 3 Restatement of the Law 2d, Torts (1977) 126–127, Section 552(1), adopted in *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 838.

■ A negligent misrepresentation occurs when one *"supplies false information* for the guidance of others." (Emphasis *sic*.) *Id.* at 149, 684 N.E.2d at 1269. In other words, a "[n]egligent misrepresentation does not lie for omissions; there must be some affirmative false statement." *Id.;* see *Zuber v. Ohio Dept. of Ins.* (1986), 34 Ohio App.3d 42, 45–46, 516 N.E.2d 244, 246–248. The Holtvogts' concealment of Mc Que Jabask's lameness cannot support a claim of negligent misrepresentation, since it was not an affirmative false statement. Thus, the trial court erred when it found that the Holtvogts negligently misrepresented the condition of the stallion to the Leals when they failed to disclose his lameness.

■ We next address the trial court's finding that the Holtvogts negligently misrepresented Mc Que Jabask by holding the stallion out as being fit to be shown. A judgment that is "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411; 461 N.E.2d 1273, 1276.

■ The trial court, in its findings of fact, concluded that the Holtvogts were experienced equine breeders and trainers and that the Leals were novices in the equine industry. Further, the court found that the Holtvogts falsely represented to the Leals that the stallion was fit to be shown and that the Holtvogts failed to exercise reasonable care in communicating this information. Finally, the trial

court concluded that the Leals justifiably relied on the Holtvogts' representations and consequently suffered a $16,000 loss.

These findings of fact and conclusions of law are not against the manifest weight of the evidence. The record reflects that the Holtvogts were quite experienced with training, breeding, showing, and boarding Arabian horses. There is evidence that the Leals were novices in the horse industry. Further, the record shows that in late 1993, the Leals decided to buy an investment stallion to start a breeding program and that they were particularly interested in Procale, a stallion owned by John Bowman. The record demonstrates that Mr. Holtvogt, after persuading the Leals that Procale was not a suitable horse for their purposes, offered them one-half interest in Mc Que Jabask. Further, there is evidence that Mr. Holtvogt represented to the Leals that with the help of the Leals' money, Mc Que Jabask could be promoted, advertised, and shown to increase his national recognition, thus enabling him to bring in higher stud fees.

The record further supports a finding that the stallion was not fit to be shown. Dr. Patterson, a veterinarian who performed an independent examination as directed by the trial court, testified at trial and concluded to a reasonable veterinary certainty that Mc Que Jabask was suffering from chronic lameness in his right fore fetlock and right rear fetlock. He stated that while walking, the stallion tended to fall over his right rear limb fairly consistently and that this lameness was also visible while the stallion was running, as there was definite short striding on the stallion's right rear fetlock and a lack of good suspension on the right fore fetlock. Dr. Patterson testified that the stallion "comes off lame." Further, Dr. Patterson testified that Mc Que Jabask's general muscle tone was consistent with that of a horse not in active athletic training. Thus, the record supports the trial court's finding that Mc Que Jabask was not fit to be shown due to his lameness.

While testifying, Dr. Patterson also stated that the conditions that he saw in the stallion's fetlocks take years to develop and thus concluded that the chronic lameness did exist in January 1994, when the agreement between the parties was entered into. Thus, competent and credible evidence was presented at trial to demonstrate that the Holtvogts supplied false information to lead the Leals to invest in Mc Que Jabask.

The record also indicates that the Holtvogts knew that Mc Que Jabask had been treated for lameness prior to January 1994. Mr. Holtvogt testified that they had taken him for lameness treatments at least half a dozen times. Thus, competent and credible evidence was presented at trial to show that the Holtvogts failed to exercise reasonable care in communicating Mc Que Jabask's lameness to the Leals.

As for the Leals' reliance on the Holtvogts' representations, the record shows that the parties had become social friends over time, and both of the Leals testified that they relied on Mr. Holtvogt's representations. In fact, Mr. Leal, who spent several days a week at the Holtvogts' barn, testified, "Joe and I have a really, really good relationship, um, I trust him a lot, he, he won my trust. He is my teacher. At that time [before the problems over Mc Que Jabask arose] he, everything he told me that good or it is not good I believed him." Thus, from our review of the record we find that competent and credible evidence supports the trial court's finding that the Leals justifiably relied upon the Holtvogts' representations that the horse was fit to be shown.

It is also clear from the record that due to their reliance on the Holtvogts' representations, the Leals had a pecuniary loss that they otherwise would not have suffered. The Leals both testified that if they had known Mc Que Jabask had been treated for lameness prior to the agreement, they would not have invested in him. Thus, our review of the record supports the trial court's finding that the Holtvogts negligently misrepresented to the Leals that Mc Que Jabask was fit to be shown.

The Holtvogts finally contend that even if Mc Que Jabask was not able to be shown, this inability would not have affected his ability to earn stud fees. They argue that there was no need to show Mc Que Jabask because he had already established a show record that would attract breeders. We cannot find support in the record for the Holtvogts' argument. At trial, Dixie Gansmiller, an experienced horse breeder, testified that a person could not successfully advertise a stallion for stud unless it was actively being shown simultaneously.

Thus, the Holtvogts' argument that their failure to disclose Mc Que Jabask's lameness did not make a claim for negligent misrepresentation is well taken. Competent and credible evidence in the record does, however, support the trial court's finding that the Holtvogts did negligently misrepresent to the Leals that Mc Que Jabask was fit to be shown. Therefore, the trial court's findings of fact and conclusions of law regarding the Holtvogts' negligent misrepresentation that the stallion was fit to be shown are not against the manifest weight of the evidence.

The Holtvogts' second assignment of error is overruled.

## III

The Holtvogts' first assignment of error is as follows:

"The trial court committed reversible error when it found that defendants' actions constituted a breach of an expressed warranty because the transaction between the parties does not meet the definitional requirements under Ohio

expressed warranty law; defendants' conduct does not rise to the level of an expressed warranty; and the integration clause in the partnership agreement precludes the court's consideration of any and all prior oral representations."

The Holtvogts' argument that there was no breach of an express warranty is threefold. First, they argue that Ohio's express warranty law is not applicable to their transaction. Second, they argue that their conduct was not sufficient to constitute an express warranty. Third, they argue that there was a clause in the parties' agreement precluding consideration of any oral representations.

We begin with the Holtvogts' argument that Ohio's express warranty law does not apply to the transaction that occurred between the parties. The Holtvogts contend that an express warranty can arise only if there has been a "sale" between the parties and that their transaction with the Leals created a "partnership agreement," not a "sale."

We first address this argument by noting that Ohio warranty law is governed by the Uniform Commercial Code, Sales, R.C. Chapter 1302. The scope of R.C. Chapter 1302 is set forth in R.C. 1302.02, which provides in part that "sections 1302.01 to 1302.98, inclusive, of the Revised Code, apply to transactions in goods." Goods are defined as "all things * * * which are moveable at the time of identification to the contract for sale * * * [and] must be both existing and identified before any interest in them can pass." R.C. 1302.01(A)(8). The Arabian stallion, Mc Que Jabask, was moveable, existing, and could be identified at the time of the contract. Thus, he would qualify as a "good" under R.C. 1302.02.

As for the Holtvogts' contention that the transaction was not a "sale," they correctly argue that a "sale" is defined as "the passing of title from the seller to the buyer for a price." R.C. 1302.01(A)(11). There is no statutory requirement, however, that full title to the good must pass from the buyer to the seller. In fact, R.C. 1302.01 explicitly states, in its definition of "goods," "[t]here may be a sale of a part interest in existing identified goods." R.C. 1302.01(A)(8). Thus, although the transaction involved the sale of only a half-interest in Mc Que Jabask, the transaction was within the definitional requirements of R.C. Chapter 1302 and thus is governed by Ohio warranty law. Therefore, the first part of the Holtvogts' argument is not well taken.

We next address the Holtvogts' argument that their conduct did not amount to an express warranty. The trial court found that "the [Holtvogts] engaged in 'puffing' at the time of the sale of the one-half interest in the horse but did not fraudulently misrepresent a material fact." Although the trial court did not enlighten us as to what part of the Holtvogts' conduct it believed to be "puffing," our review of the record leads us to believe that the trial court was talking about

the five contested statements that the Leals claim that the Holtvogts made. The Holtvogts contend that the trial court's finding that they engaged in "puffing" is inconsistent with the trial court's conclusion that they gave the Leals an express warranty.

R.C. 1302.26 states the following:

"(A) Express warranties by the seller are created as follows:

"(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"(3) * * *

"(B) * * * [A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

 "Puffing," or merely stating the seller's opinion, cannot amount to an express warranty. See *Slyman v. Pickwick Farms* (1984), 15 Ohio App.3d 25, 28, 15 OBR 47, 50–51, 472 N.E.2d 380, 383–384; R.C. 1302.26(B). The five contested statements were the subject of extensive testimony during the trial. Mr. Holtvogt denied making any of these statements and the Leals repeatedly testified that Mr. Holtvogt did make these statements. The trial court seems to have found the five contested statements to be "puffing." Our review of the record shows that there is credible and competent evidence that these five contested statements were no more than "puffing." The Holtvogts correctly argue that when statements are mere "puffing," they cannot constitute an express warranty.

We cannot sustain this assignment of error, however, because we find that the Holtvogts breached an implied warranty of fitness for a particular purpose.

In its entry, the trial court found the following:

"[T]he information the [Holtvogts] failed to apprise the [Leals] of was the lameness of the horse at the time the contract was executed in January 1994.

"The [Leals] suffered damages in the amount of $16,000.00 as a result of this negligent misrepresentation.

"The *same set of facts* establishes a cause of action for breach of express warranty *on the condition of the horse for the purposes intended* * * *." (Emphasis added.)

In its entry, the trial court did not just say that an express warranty was breached, but rather said that an "express warranty *on the condition of the horse for the purposes intended*" was breached. (Emphasis added.). We conclude that the trial court intended to say that an implied warranty of fitness for a particular purpose was breached. Our conclusion is supported by the trial court's statement that the same set of facts establishes claims for both a breach of express warranty on the condition of the horse for the purposes intended and negligent misrepresentation. We note that the elements of a claim for negligent misrepresentation and breach of an implied warranty of fitness for a particular purpose are quite similar, while the elements of negligent misrepresentation and breach of an express warranty are not similar. Thus, we conclude that the trial court, in its conclusions of law, intended to say that an implied warranty of fitness for a particular purpose was given and breached by the Holtvogts when they failed to disclose Mc Que Jabask's lameness to the Leals.

An implied warranty of fitness for a particular purpose is covered by the Uniform Commercial Code, Sales, R.C. 1302.28, which provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose."

Ohio courts have set forth the following test to determine whether an implied warranty of fitness for a particular purpose has been created: (1) the seller must have reason to know of the buyer's particular purpose; (2) the seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish or select appropriate goods; and (3) the buyer must, in fact, rely upon the seller's skill or judgment. *Hollingsworth v. The Software House, Inc.* (1986), 32 Ohio App.3d 61, 65, 513 N.E.2d 1372, 1375–1376; *Delorise Brown, M.D., Inc. v. Allio* (1993), 86 Ohio App.3d 359, 362, 620 N.E.2d 1020, 1021–1022.

The first element requires that Mr. Holtvogt knew why the Leals decided to buy an interest in Mc Que Jabask. From our review of the record, we see that Mr. Holtvogt clearly knew that the Leals wanted to buy an interest in the stallion to start a breeding program. Mr. Holtvogt testified:

" * * * [The Leals] had explained what type of horse they were looking for [and] it seemed to me that [Mc Que] Jabask fit the bill [of] what they were looking for and that's why I mentioned to them, uh, to Ferdinand that there might be a possibility that we would be interested in selling part interest in him.

"* * * [T]he things that they were saying, * * * those things were, were present in, in [Mc Que] Jabask * * *.

"* * * [I]t just, it made sense that, you know, in the fact that the Leals could breed to [Mc Que] Jabask * * *. * * * Um, we could, uh, with the experience and the reputation that we had we could help market their foals, um, it was, I really felt that it was something that could work."

Thus, evidence of the first element of an implied warranty of fitness for a particular purpose was presented at trial.

The second element requires that Mr. Holtvogt had reason to know that the Leals were relying on his skill and judgment to select or furnish the appropriate goods. Evidence presented at trial shows that Mr. Holtvogt knew, or at least should have known, that the Leals were relying on his judgment when they purchased an interest in the stallion. The relationship between Mr. Holtvogt and Mr. Leal was like that of a teacher and student. Mr. Leal spent a great deal of time at the Holtvogts' barn, helping Mr. Holtvogt with the horses and learning from Mr. Holtvogt. Mr. Holtvogt testified that he was an expert trainer and breeder with Arabian horses, and the evidence shows that he knew Mr. Leal knew very little about horses. Furthermore, the Leals testified that they were interested in purchasing another horse, Procale, but that Mr. Holtvogt steered them away from that horse, saying that horse was not the type of horse that the Leals wanted to buy. Mr. Holtvogt even testified that he mentioned Mc Que Jabask to the Leals because the stallion was the type of horse that they were looking for. Thus, evidence of the second element of an implied warranty of fitness for a particular purpose was presented at trial.

The third element requires that the Leals actually did rely upon Mr. Holtvogt's skill and judgment when they purchased an interest in the stallion. The trial court found that the Leals justifiably relied upon the Holtvogts' representations regarding the stallion. This finding is not against the manifest weight of the evidence. As stated earlier, there was competent and credible evidence presented at trial to support this finding, as both Leals were novices in the horse industry and they testified that they trusted Mr. Holtvogt and considered him to be the expert. Thus, evidence of the third element was presented at trial.

■ Because all three elements were proven at trial, we conclude that an implied warranty of fitness for a particular purpose was given by the Holtvogts to the Leals at the time of the sale. There must be evidence that the warranty was breached if the Leals are to recover. *Delorise Brown, M.D., Inc.,* 86 Ohio App.3d at 363, 620 N.E.2d at 1022. "Whether a warranty has failed to fulfill its essential purpose is ordinarily a determination for the factfinder." *Id.*

■ The trial court found that a warranty was breached by the Holtvogts because the horse was lame. As stated above, competent and credible evidence was presented to support the trial court's finding that Mc Que Jabask suffered

from chronic lameness at the time of the sale. At trial, Dixie Gansmiller testified that even though a lame stallion could stand for stud, its lameness would affect her decision whether to breed her mares with it. Thus, we conclude that competent and credible evidence in the record does demonstrate that Mc Que Jabask was not fit for the particular purpose intended by the Leals when they invested in him.

Finally, we address the Holtvogts' argument that there was no express warranty because the partnership agreement had an integration clause that nullified any and all prior oral representations that were not specifically mentioned within the document. As we stated above, there was not an express warranty in this case, so we will consider this argument by applying it to the Holtvogts' breach of an implied warranty of fitness for a particular purpose.

The partnership agreement that the parties entered into had the following clause: "This contract contains the entire agreements between the parties and no oral agreements shall be binding nor shall any modification of this agreement be binding unless in writing." As we have already stated, the transaction between the Leals and the Holtvogts is governed by the Uniform Commercial Code, Sales, R.C. Chapter 1302. R.C. 1302.05, which discusses final written expressions and the admissibility of parol or extrinsic evidence, states:

"Terms * * * which are * * * set forth in a writing intended by the parties as a final expression of their agreement * * * may not be contradicted by evidence of any *prior agreement* or of a *contemporaneous oral agreement* but may be explained or supplemented * * *." (Emphasis added.)

We first note that the integration clause in the agreement could preclude consideration of an express warranty, if an express warranty had been given by the Holtvogts. We have already stated, however, that no express warranty was given but rather the Holtvogts breached an implied warranty of fitness for a particular purpose when they failed to disclose Mc Que Jabask's lameness to the Leals. The Holtvogts' failure to disclose this information does not amount to a "prior agreement" or "contemporaneous oral agreement" that the Leals are trying to introduce to change the terms of the agreement. An integration clause does not affect an implied warranty of fitness for a particular purpose because an integration clause essentially says that everything the parties agreed to is within the four corners of the document. An implied warranty of fitness for a particular purpose is not something that is explicitly agreed to or discussed by the parties. In fact, an implied warranty of fitness for a particular purpose can be given without the parties' knowledge.

We do note that another Ohio appellate court has stated, "It has been held that an integration clause * * * which provides that the entire agreement between the

parties is contained within the four corners of the contract is effective to waive any implied warranty. *Nick Mikalacki Constr. Co. v. M.J.L. Truck Sales, Inc.* (1986), 33 Ohio App.3d 228, 515 N.E.2d 24." *Schneider v. Miller* (1991), 73 Ohio App.3d 335, 339, 597 N.E.2d 175, 178. However, we do not believe that this statement accurately summarizes the holding in the *Nick Mikalacki Constr. Co.* case. In both the *Schneider* and *Nick Mikalacki Constr. Co.* cases, the contracts in question involved integration clauses *and* "as is" clauses. In *Nick Mikalacki Constr. Co.*, the court held that when there is an integration clause in a contract that has an "as is" clause, the "as is" clause will prevent any implied warranties from arising. *Nick Mikalacki Constr. Co. v. M.J.L. Truck Sales, Inc.* (1986), 33 Ohio App.3d 228, 229–230, 515 N.E.2d 24, 25–27. Thus, it was the "as is" clause that prevented any implied warranty, not the integration clause, as stated in *Schneider.* There was no "as is" clause in the agreement between the Holtvogts and the Leals. Thus, reliance on *Schneider* or *Nick Mikalacki Constr. Co.* would be misplaced.

The argument that the integration clause prevented an implied warranty of fitness for a particular purpose from arising is not well taken.

The Holtvogts' first assignment of error is overruled.

## IV

The Holtvogts' third assignment of error is as follows:

"The trial court committed reversible error when it awarded defendants only $800.23 out of the $4,167.98 owed to defendants by plaintiffs."

The Holtvogts make two alternative arguments under this assignment of error. First, they claim that the trial court erred when it essentially rescinded their agreement with the Leals by awarding the Leals the $16,000 they invested in the stallion. Second, and in the alternative, they contend that the agreement was not rescinded but that the Leals were awarded merely $16,000 in damages. They argue that regardless of which argument is followed, the agreement is still enforceable and the Leals should have to pay $3,367.75 for half of the expenses incurred for Mc Que Jabask.

The trial court, in its findings of fact, determined the following:

"As a result of [the] negligent misrepresentation, the [Leals] invested $16,-000.00 they would have otherwise not invested and were damaged in this amount.

"* * *

"The [Holtvogts] also presented evidence the [Leals] owed the [Holtvogts] stable fees for the horses Kalua, Tsequel, Allee and CS Coquette in the amount of

$800.23 * * *. *The Court rejects the claim that any such fees are owed by [Leals] for McQue* [sic] *Jabask.*" (Emphasis added.)

In its conclusions of law, the trial court held:

"The [Leals] suffered damages in the amount of $16,000.00 as a result of [the] negligent misrepresentation.

"* * *

"The [Holtvogts] have established they provided services for four of the [Leals'] other horses for which they have not been paid and for which the total amount is $800.93 [*sic*]."

In its final judgment entry, the court characterized the $800.23 as "compensatory damages."

■ Our review of the record shows that the trial court concluded that if the Holtvogts had disclosed the stallion's lameness to the Leals, the Leals would have never entered into the agreement. Thus, we find no error in the trial court's decision to hold the Leals harmless for any expenses incurred under the partnership. The Holtvogts should not be able to collect half of the costs incurred under a partnership which they misled the Leals into entering.

The Holtvogts' third assignment of error is overruled.

V

The Holtvogts' fourth assignment of error is as follows:

"Even if this court finds that plaintiffs presented sufficient evidence to support their negligent misrepresentation and expressed warranty claims, the trial court's award of $16,000.00 to plaintiffs was against the manifest weight of the evidence and contrary to law."

■ Although this assignment of error raises a manifest-weight issue, the Holtvogts do not make an argument regarding the evidence. Instead, they argue that the trial court essentially rescinded the parties' agreement without returning the parties to the positions they occupied before the agreement was signed. In support, they argue that the Leals attempted to breed two of their mares to Mc Que Jabask for free under the agreement, and that, as a result, one of the mares produced a foal. They claim that the normal stud fee is $1,000 per horse and that because the agreement was rescinded, the Leals should have to pay $2,000 for their breedings. We find this argument to be well taken. Our review of the record indicates, however, that returning the parties to the positions they occupied before the agreement will not be an easy task.

We begin by noting that the record indicates that the Holtvogts charged varying stud fees for Mc Que Jabask. The record reveals stud fees normally ranging between $900 and $1,000, with one person winning a free breeding with the stallion. The record also indicates that the Holtvogts would deduct stud fee credits from the Leals' bill when the mares being bred with Mc Que Jabask did not "catch," *i.e.*, conceive. We believe that this indicates that in at least some instances, the Holtvogts would refund the stud fees to customers whose mares were not in foal as a result of the breeding. If this is true, the Leals would owe the Holtvogts only $1,000, because only one of their mares produced a foal from the breedings.

We also note that the Holtvogts present only half the story when they argue that they were not returned to their original position. The record reveals that in paying for their half of Mc Que Jabask's expenses under the agreement, the Leals made at least three payments totaling $908. Thus, if the parties are to be returned to their original positions, the Holtvogts should return all the money the Leals paid for Mc Que Jabask.

The Holtvogts' fourth assignment of error is sustained. The case will be remanded to the trial court for a determination of the amounts owed to each party to return the parties to their original positions before the agreement was entered into.

## VI

The Holtvogts' fifth assignment of error is as follows:

"The trial court committed reversible error when it arbitrarily and capriciously awarded defendants a meager two thousand dollars and no/cents ($2,000.00) in attorney fees since the parties stipulated that the professional services of defendants' counsel, which totaled twenty–three thousand seven hundred forty–five dollars and no/cents ($23,745.00), was fair and reasonable and since over 20% of defendants' attorney fees were attributable to defendants' defamation claims."

The Holtvogts argue that the trial court's award of attorney fees was inadequate and contrary to law. In its first entry, the trial court awarded the Holtvogts punitive damages in the amount of $1,000. That amount was later vacated by the trial court when it realized that the parties had stipulated earlier in the case that there would be an additional hearing to present evidence on attorney fees if the court found that punitive damages were appropriate. Following this hearing, the trial court awarded the Holtvogts $3,000 for punitive damages and attorney fees. The Holtvogts argue that because the parties stipulated that the professional services performed by the Holtvogts' counsel were necessary and reasonable, the only issue that the court had to determine

was the total percentage of attorney fees attributable to the Holtvogts' defamation claim. Further, they argue that the award is unreasonably small in light of Mrs. Leal's malicious conduct.

When punitive damages are awarded, a trial court has discretion to award attorney fees. See *Columbus Fin., Inc. v. Howard* (1975), 42 Ohio St.2d 178, 183, 71 O.O.2d 174, 177, 327 N.E.2d 654, 658 (stating that "[i]f punitive damages are proper, the aggrieved party *may* also recover reasonable attorney fees"). (Emphasis added.) As we note below, in our discussion of the Leals' third cross–assignment of error, the trial court's award of punitive damages is supported by the record. Thus, an award of attorney fees was permitted in this case.

We begin by addressing the Holtvogts' argument that because the parties stipulated that the professional services performed by the Holtvogts' counsel were necessary and reasonable, the only issue that the court had to determine was the total percentage of attorney fees attributable to the Holtvogts' defamation claim. A trial court must consider the following factors when awarding attorney fees: "(1) the time and labor involved in maintaining the litigation, (2) the novelty, complexity, and difficulty of the questions involved, (3) the professional skill required to perform the necessary services, (4) the experience, reputation, and ability of the attorneys, and (5) the miscellaneous expenses of the litigation." *Uebelacker v. Cincom Sys., Inc.* (1992), 80 Ohio App.3d 97, 105, 608 N.E.2d 858, 863. Further, there must be evidence presented regarding the reasonableness of attorney fees before the trial court can make such an award. *Id.* In consideration of all of these factors, we cannot agree with the Holtvogts that because the necessity and reasonableness of the attorney fees were stipulated, all the trial court needed to do was pick a percentage of the fees to award. The trial court needed to consider all of the above factors. Thus, this part of the Holtvogts' argument is not well taken.

We next address the Holtvogts' argument that such a minimal award in the light of Mrs. Leal's malicious conduct is unreasonable. The Holtvogts argue that the $3,000 award for punitive damages and attorney fees breaks down into $1,000 for punitive damages and $2,000 for attorney fees. Assuming this to be the case, we cannot find error in the trial court's award.

As we just noted, there are numerous factors that a trial court must consider before making an award of attorney fees. From our review of the record, we conclude that there was sufficient evidence presented to the trial court for it to consider each of the above factors before making its determination. In fact, we note that on March 10, 1997, a hearing was held solely for the attorneys to present evidence to the trial court regarding punitive damages and attorney fees.

At this hearing, one of the witnesses was the Holtvogts' counsel, who testified regarding the bills for his legal services and the breakdown of his fees. Although the trial court did not state its reasons for awarding attorney fees, there is no evidence in the record to lead us conclude that the trial court did not consider these factors when making its determination. In the absence of evidence to the contrary, we must presume that the trial court did consider these factors when making its award. See *Dayton Women's Health Ctr., Inc. v. Enix* (1993), 86 Ohio App.3d 777, 780, 621 N.E.2d 1262, 1264. As we stated above, an award of attorney fees is discretionary with the trial court. See *Columbus Finance*, 42 Ohio St.2d at 183, 71 O.O.2d at 176–177, 327 N.E.2d at 658. From our review of the record, we cannot say that the trial court abused its discretion.

The Holtvogts' fifth assignment of error is overruled.

We now address the Leals' cross–assignments of error.

## VII

The Leals' first cross–assignment of error is as follows:

"The trial court erred in determining the appellants had engaged in only negligent misrepresentation when appellees produced evidence sustaining their burden of proof on the claim of fraud."

The Leals contend that at trial they presented evidence of two instances of fraud by the Holtvogts: first, they argue that there was evidence to show that the Holtvogts' statements prior to the sale of the stallion were fraud and not mere "puffing"; second, they argue that the Holtvogts' failure to disclose Mc Que Jabask's lameness constitutes fraud. The Leals also claim that the trial court erred when it found that malice was a necessary element of fraud.

The trial court found the following on the issue of fraud:

"Factually, the Court determines the Defendants engaged in 'puffing' at the time of the sale of the one-half interest in the horse but did not fraudulently misrepresent a material fact."

This sentence is the only reference in the trial court's entry that accounts for the Leals' claim that the Holtvogts' statements prior to the sale of the stallion constituted fraud. The trial court did not specifically address whether the Holtvogts' failure to disclose the stallion's lameness constituted fraud, but rather characterized it as negligent misrepresentation. As discussed above, the Holtvogts' failure to disclose the stallion's lameness cannot establish a claim of negligent misrepresentation.

We begin by addressing the Leals' argument that the Holtvogts committed fraud with the statements that they made prior to the sale of the one-half interest

in Mc Que Jabask. The Leals contend that Mr. Holtvogt committed fraud when he made the five contested statements to induce them to invest in the stallion. At trial, the Holtvogts claimed that they did not make the five contested statements.

In its entries, the trial court did not explain whether it found all of the five contested statements to be "puffing," or only some of the five contested statements to be "puffing," with the rest contributing to the trial court's finding of negligent misrepresentation. The trial court also failed to state which, if any, of the five contested statements it believed were actually made by Mr. Holtvogt. Rather, it simply found that "the Defendants engaged in 'puffing' at the time of the sale."

Because it is not clear to us whether the trial court found that any of the five contested statements were actually made, we will not address this part of the Leals' argument. Furthermore, there is really no need for us to address this argument because we find that the Holtvogts' failure to disclose Mc Que Jabask's lameness does constitute fraud.

The Leals contend that the second instance of fraud committed by the Holtvogts was their failure to disclose the stallion's lameness. As we found earlier, an action for negligent misrepresentation is actionable only when an affirmative false statement has been made; it is not actionable for omissions. A claim of fraud, however, " 'is maintainable not only as a result of affirmative misrepresentations, but *also for negative ones, such as the failure of a party to a transaction to fully disclose facts* of a material nature where there exists a duty to speak.' " (Emphasis added.) *Textron Fin. Corp.,* 115 Ohio App.3d at 153, 684 N.E.2d at 1272, quoting *Starinki v. Pace* (1987), 41 Ohio App.3d 200, 203, 535 N.E.2d 328, 331. Thus, although the Holtvogts' failure to disclose the stallion's lameness could not be negligent misrepresentation, it could constitute fraud.

The elements of fraud are as follows:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Mussivand v. David* (1989), 45 Ohio St.3d 314, 322, 544 N.E.2d 265, 273; *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 169, 10 OBR 500, 501–502, 462 N.E.2d 407, 408–409.

The first element of fraud requires that the Holtvogts concealed a fact that they had a duty to disclose. "It has generally been held that nondisclo-

sure of a fact will become the equivalent of fraudulent concealment when it is the duty of the person to speak in order to place the other party on equal footing with him." *Davis v. Sun Refining & Marketing Co.* (1996), 109 Ohio App.3d 42, 55, 671 N.E.2d 1049, 1058. A person's duty to speak does not necessarily depend on the existence of a fiduciary relationship; " '[i]t may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence.' " *Mancini v. Gorick* (1987), 41 Ohio App.3d 373, 374–375, 536 N.E.2d 8, 10, quoting *Cent. States Stamping Co. v. Terminal Equip. Co.* (C.A.6, 1984), 727 F.2d 1405, 1409. A review of the record shows that the Holtvogts failed to disclose Mc Que Jabask's lameness to the Leals. The record also reveals that both of the Leals testified that they considered Mr. Holtvogt to be a professional trainer and that they trusted his expertise. There is evidence in the record that Mr. Holtvogt had knowledge of this confidence, since he knew that the Leals were not experienced in the equine industry. The evidence also shows that Mr. Holtvogt informed the Leals of his expertise. Mr. Leal testified:

" * * * [Mr. Holtvogt] told me about his reputation that he's been doing this since he was a kid, he's been around horses when he was a kid and he told me that he's been to a lot of shows, Arabian shows and people know him, his reputation * * *."

▮ The second element of fraud would be met if the concealed lameness of Mc Que Jabask was material to the transaction. A fact is material if it is likely, "under the circumstances, to affect the conduct of a reasonable person with reference to the transaction." *Van Camp v. Bradford* (1993), 63 Ohio Misc.2d 245, 255, 623 N.E.2d 731, 737–738. Both of the Leals testified that if they had known of the stallion's lameness, they would not have bought a one-half interest in him.

The third element of fraud requires that the Holtvogts knew that Mc Que Jabask was chronically lame at the time of the sale. As stated earlier, our review of the record demonstrates that evidence was presented to show that the Holtvogts knew that Mc Que Jabask had been treated for lameness numerous times prior to the sale.

▮ The fourth element of fraud requires that the Holtvogts, in their failure to disclose Mc Que Jabask's lameness, intended to induce the Leals to buy an interest in the stallion. Intent must be inferred from the totality of the circumstances, because it is rarely provable by direct evidence. *Davis,* 109 Ohio App.3d at 56, 671 N.E.2d at 1058–1059. At trial, Mr. Holtvogt testified that before the contract, the couples discussed Mc Que Jabask's show records, breedings, and offspring—everything about the stallion except his lameness.

Considering all of the circumstances surrounding the sale, the record supports an inference that the Holtvogts avoided telling the Leals of the stallion's lameness in order to induce them to buy.

■■■ The fifth element of fraud requires that the Leals justifiably relied on the Holtvogts' description of the stallion and their failure to inform the Leals of its lameness. "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties." *Crown Prop. Dev., Inc. v. Omega Oil Co.* (1996), 113 Ohio App.3d 647, 657, 681 N.E.2d 1343, 1349. The trial court, in its findings of fact, concluded that the Leals justifiably relied on the Holtvogts' representations of the stallion. From our review of the record, we find that there is competent and credible evidence to support this finding.

The final element of fraud requires that the Leals suffered an injury due to their reliance. The trial court found that the Leals were injured when they invested $16,000 in the stallion due to their belief that he was healthy. From our review of the record, we find competent and credible evidence to support this finding.

Because all six elements of fraud were proven, we agree with the Leals that the Holtvogts committed fraud when they failed to disclose Mc Que Jabask's chronic lameness.

Finally, we address the Leals' argument that the trial court erred when it found that malice is a necessary element of fraud. We find no basis for this argument, since a review of the trial court entry fails to demonstrate to us that the trial court made such a finding. The trial court entry states as follows:

"Factually, the Court determines the Defendants engaged in 'puffing' at the time of the sale of the one-half interest in the horse but did not fraudulently misrepresent a material fact.

"* * *

"Factually, the Court finds no malice on the part of the Defendants in this regard."

From the trial court's entry, it does not seem to us that the trial court required malice as an element of a claim of fraud. The sentence regarding malice merely states one of the trial court's many findings of fact. Thus, this argument is not well taken.

■■■ Although we conclude that the trial court erred when it found against the Leals on their claim of fraud, we further conclude that this error was harmless. For the reasons set forth in Part VIII below, we conclude that the trial court did not err in failing to award attorney fees or punitive damages against the Holtvogts. The trial court did find, erroneously in our opinion, that the Holt-

vogts had negligently misrepresented the condition of Mc Que Jabask by failing to inform the Leals of his chronic lameness. Presumably, the trial court took this into consideration when it fashioned the remedy of rescission, placing the Leals in the condition they were in before the transaction. The trial court's mischaracterization of the Holtvogts' conduct as negligent misrepresentation, rather than fraud, had no adverse consequences to the Leals, since we conclude that they were not entitled to punitive damages or attorney fees, and the remedy of rescission gave them everything to which they would be entitled as a result of the fraud.

The Leals' first cross–assignment of error is overruled.

## VIII

The Leals' second cross–assignment of error is as follows:

"The trial court erred in failing to award appellees punitive damages and attorney fees once they had proven each and every element of fraud."

The Leals claim that they should be awarded punitive damages and attorney fees based on the fact that the Holtvogts committed fraud. In particular, they argue that these damages are warranted because Mr. Holtvogt took advantage of the relationship of trust he developed with Mr. Leal. As we concluded above, the Leals did prove that the Holtvogts committed fraud when they failed to disclose Mc Que Jabask's lameness. The trial court did not specifically address punitive damages or attorney fees for the Leals but did find no malice on the part of the Holtvogts.

This court has previously held that punitive damages may be proper in cases involving fraud. *Davis,* 109 Ohio App.3d at 58, 671 N.E.2d at 1060, citing *Byrley v. Nationwide Life Ins. Co.* (1994), 94 Ohio App.3d 1, 20, 640 N.E.2d 187, 199–200. We have also held that where punitive damages are warranted in a case involving fraud, attorney fees may also be awarded. *Farmers State Bank & Trust Co. v. Mikesell* (1988), 51 Ohio App.3d 69, 86, 554 N.E.2d 900, 914–915; *Roberts v. Mason* (1859), 10 Ohio St. 277, 281, 1859 WL 78.

"To establish a claim for punitive damages in an action for fraud, [a party] must demonstrate, in addition to proving the elements of the tort itself, 'that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious.'" *Davis,* 109 Ohio App.3d at 58, 671 N.E.2d at 1060, quoting *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, paragraph three of the syllabus. From our review of the record, we cannot agree that the Holtvogts acted with malice toward the Leals. We do not believe that the Holtvogts' conduct had the requisite ill will or such a conscious

disregard for the rights and safety of others to constitute malice as a matter of law. Thus, the trial court could find, as it did, that there was no malice, and an award of punitive damages and attorney fees for the Leals would be improper in this case.

The Leals' second cross–assignment of error is overruled.

## IX

The Leals' third cross–assignment of error is as follows:

"The trial court erred in determining that appellee defamed the appellant, Joe Holtvogt, and that he was entitled to damages."

The Leals' arguments in this cross–assignment of error are fourfold. First, the Leals argue that Mrs. Leal's statements regarding Mr. Holtvogt were mere opinion. Second, they argue that Mrs. Leal's statements could have been interpreted as innocent or defamatory and that under Ohio's "innocent construction rule," the innocent interpretation should be taken. Third, the Leals contend that the trial court erred in finding Mrs. Leal's statements to be slander *per se* because they were slander *per quod*. The Leals point out that this distinction is important because slander *per quod* requires the offended party to prove special damages resulting from the statements. Fourth, the Leals argue that the trial court erred when it found that Mrs. Leal's statements were made with malice. As part of this argument, the Leals also contend that the trial court erred when it awarded the Holtvogts' punitive damages.

We begin by addressing the Leals' argument that Mrs. Leal's statements regarding Mr. Holtvogt were mere opinion. The trial court found that Mrs. Leal "made disparaging remarks about the integrity and honesty of [Mr. Holtvogt] * * * which constituted slander." Thus, the trial court concluded that Mrs. Leal's statements were more than mere opinion.

The Ohio Constitution provides, "Every citizen may freely speak * * * his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech * * *." Because the Ohio Constitution provides this guarantee for the protection of opinion, we must examine whether Mrs. Leal's statements were opinion or fact. See *Condit v. Clermont Cty. Review* (1996), 110 Ohio App.3d 755, 759, 675 N.E.2d 475, 477–478.

Ohio courts use a "totality of the circumstances" test to determine whether a statement is fact or opinion. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 282, 649 N.E.2d 182, 185 certiorari denied, 516 U.S. 1043, 116 S.Ct. 700, 133 L.Ed.2d 657. Under this test, a court must consider the following four factors: (1) the specific language used, (2) whether the statement is

verifiable, (3) the general context of the statement, and (4) the broader context of the statement. *Id.* This is not a bright-line test, but is a fluid standard, with the weight given to each of the factors varying depending on the circumstances of the case. *Id.*

First, we must examine the specific language used. This factor calls for us to determine whether an ordinary person would view Mrs. Leal's words to be of a factual nature, where their meaning is readily ascertainable, or opinion, where their meaning is ambiguous. *Condit,* 110 Ohio App.3d at 759, 675 N.E.2d at 477–478; *Vail,* 72 Ohio St.3d at 282, 649 N.E.2d at 185–186. Our review of the record indicates that Mrs. Leal contacted customers of the Holtvogts' barn and told them that Mr. Holtvogt had lied to the Leals about Mc Que Jabask's value, show records, and stud fees, and that Mr. Holtvogts "was cheating her out of breeding fees for their partnership." We believe that an ordinary person would view these statements as fact, not mere opinion, because their meaning is clearly ascertainable, not ambiguous.

Second, we consider whether Mrs. Leal's statements were verifiable. "When the statement lacks a plausible method of verification, a reasonable [person] will not believe that the statement has specific factual content." *Condit,* 110 Ohio App.3d at 760, 675 N.E.2d at 478. The Ohio Supreme Court has stated that statements regarding a person's honesty are possibly verifiable. *Vail,* 72 Ohio St.3d at 283, 649 N.E.2d at 186. The record reveals that Mrs. Leal did say that Mr. Holtvogt had lied to her, cheated her out of money, and that she also called him untrustworthy. Thus, we believe that Mrs. Leal's statements should be viewed as verifiable.

Finally, we consider both the specific and broader contexts of Mrs. Leal's statements. The record shows that three people testified that Mrs. Leal telephoned them asking about their interactions with Mr. Holtvogt. They testified that she asked them whether Mr. Holtvogt had revealed to them that the Leals were part owners in Mc Que Jabask, whether they had bred mares with Mc Que Jabask, and, if so, what amount of stud fees they paid. As discussed above, they testified that Mrs. Leal told them that Mr. Holtvogt made various misrepresentations to her and that he was untrustworthy. In fact, one of the witnesses testified that Mrs. Leal told her "that [she] should keep a good eye on [her] mare and should consider the possibility of moving that mare away from [Mr.] Holtvogt's barn because she [Mrs. Leal] did not feel that they gave proper care and that [her] mare might be in possible danger being there because she [Mrs. Leal] would not put it past Joe Holtvogt to burn down his barn, horses and all, to collect the insurance money."

The witnesses also testified that Mrs. Leal sounded upset, irrational, and hostile on the phone. All three testified that Mrs. Leal made statements about

her intentions of doing everything she could to put Mr. Holtvogt out of business. Two of the witnesses also testified that she informed them that she was a former Dayton police officer. We believe that a reasonable person who heard these statements from a woman on the phone would at least be concerned about doing business with Mr. Holtvogt and suspicious of his integrity. While Mrs. Leal's anger and hostility might lead a reasonable person to discount some of her accusations, it is also conceivable that a reasonable person would just assume that he or she would be angry, too, if he or she had been tricked in these ways. Our conclusion is supported by the testimony of one of the witnesses, who stated that after discussing Mrs. Leal's call, he and his wife agreed that maybe it was good that the mare they bred with Mc Que Jabask did not "catch."

We find that the trial court's conclusion that Mrs. Leal's statements regarding Mr. Holtvogt were more than mere opinion is supported by credible and competent evidence in the record. This part of the Leals' argument is not well taken.

 We next address the Leals' argument that Mrs. Leal's statements could have been interpreted as innocent or defamatory, and that under Ohio's "innocent construction rule," the innocent interpretation should be taken. The "innocent construction" rule states that if a statement is "susceptible [of] two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423, 453 N.E.2d 666, 669; see, also, *Van Deusen v. Baldwin* (1994), 99 Ohio App.3d 416, 419, 650 N.E.2d 963, 965. Unfortunately, the Leals' briefs do not explain how Mrs. Leal's statements could be interpreted innocently. From our review of the record, we cannot see how Mrs. Leal's statements could have any meaning other than that Mr. Holtvogt is untrustworthy. Thus, we conclude that this part of the Holtvogts' argument is not well taken.

We next address the Leals' argument that the trial court erred in finding Mrs. Leal's statements to be slander *per se* because they were slander *per quod*. The Leals argue that slander *per quod* requires a showing of actual damages and that because the Holtvogts failed to prove that they established any damages, they should not have received a damage award on this claim. The trial court did not mention slander *per se* or slander *per quod*, but generally found Mrs. Leal's statements to be defamatory.

 This court has previously held that slander *per se* "means that the slander is accomplished by the very words spoken." *King v. Bogner* (1993), 88 Ohio App.3d 564, 567, 624 N.E.2d 364, 366; *Rainey v. Shaffer* (1983), 8 Ohio App.3d 262, 264, 8 OBR 354, 356–357, 456 N.E.2d 1328, 1331–1332. When a claim

of slander *per se* is established, damages will be presumed. *King,* 88 Ohio App.3d at 567, 624 N.E.2d at 366–367. A statement that "tend[s] to injure one in one's trade or occupation" will be considered slander *per se.* *Id.* at 568, 624 N.E.2d at 366; *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 353, 609 N.E.2d 216, 221–222. From our review of the record, we find that there is competent and credible evidence that Mrs. Leal's statements would tend to harm Mr. Holtvogt's business. The witnesses testified that Mrs. Leal expressed to them her intention of putting Mr. Holtvogt out of business. Further, at least one witness stated that Mrs. Leal encouraged her to remove her mares from the Holtvogt's barn. Thus, we find no error in the trial court's award of damages for this defamation because we believe that Mrs. Leal's statements constitute slander *per se.* This part of the Leals' argument is not well taken.

Finally, we address the Leals' argument that the trial court erred when it found that Mrs. Leal's statements were made with malice. The trial court found that "by clear and convincing evidence [Mrs. Leal's] statements were made with malice."

 To receive punitive damages on a claim for defamation *per se,* one must separately prove either actual damages or show that the other party acted with actual malice. *Bryans v. English Nanny & Governess School, Inc.* (1996), 117 Ohio App.3d 303, 317, 690 N.E.2d 582, 591. Actual malice has been defined as "anger, hatred, ill will, a spirit of revenge, or a reckless disregard of the consequences or the legal rights of others." *Id.; Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 248, 543 N.E.2d 1277, 1283–1284.

 Our review of the record supports the trial court's finding that Mrs. Leal's statements constituted malice. One of the witnesses testified that during their phone conversation, Mrs. Leal said that she "wanted her money back and that she would do anything in her power to get that money back and that she was going to do everything that she could to see that [Mr. Holtvogt] either went out of business or [gave] her money back." One witness testified that Mrs. Leal told her to consider moving her mare from Mr. Holtvogt's barn. From this testimony, we conclude that there is competent and credible evidence in the record to support the trial court's finding of actual malice in Mrs. Leal's statements. As actual malice was demonstrated, we cannot find error in the trial court's award of punitive damages. This part of the Leals' argument is not well taken.

The Leals' third cross–assignment of error is overruled.

## X

The Holtvogts' first, second, third, and fifth assignments of error having been overruled, all of the Leals' cross-assignments of error having been overruled, and

the Holtvogts' fourth assignment of error having being sustained, the judgment of the trial court is affirmed, in part, and reversed, in part, and this cause is remanded for further proceedings consistent with this opinion, which would include a recomputation of damages to reflect the Leals' obligations to the Holtvogts for stud fees for the mares they bred with Mc Que Jabask, and the Holtvogts' obligation to refund the moneys paid to them by the Leals as and for their share of Mc Que Jabask's expenses.

*Judgment accordingly.*

WOLFF and GRADY, JJ., concur.